1  KEVIN V. RYAN
   United States Attorney
2
   JACQUELINE C. BROWN
3  Member, New York Bar
   Trial Attorney, Tax Division
4  U.S. Department of Justice
   Post Office Box 7238
5  Ben Franklin Station
   Washington, D.C.  20044
6  Telephone: (202) 616-9482

7  Attorneys for Plaintiff, United States

8              IN THE UNITED STATES DISTRICT COURT FOR THE
                     NORTHER DISTRICT OF CALIFORNIA
9                        SAN FRANCISCO DIVISION

10 STEVEN H. KASSEL,                    )
                                        )
11              Plaintiff,              )
                                        )   Civil No. 3:06-cv-03273-SC
12       v.                             )
                                        )   **Tables of Contents and Authorities**
13 UNITED STATES OF AMERICA,            )   **Pre-Trial Brief of the Defendant**
                                        )   **United States**
14              Defendant.              )

15                          TABLE OF CONTENTS

16
                                                                    Page
17
Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Questions Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

I.   Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

II.  Legal Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

III.   Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

       A.    Kassel is subject to penalty under I.R.C. § 6700 . . . . . . . . . . . . . . . . . . . . .  8

             1.    Kassel participated, directly and indirectly, in the
                   sale of the TRS system . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

             2.    The TRS system and materials contain mistatements or
                   omissions of law and misleading information regarding
                   the internal revenue laws. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

             3.    Kassel Knew the TRS system was Incorrect and Misleading  . . . . . . . .  18
28

B.   The Assessed Amount of the Penalty is Correct . . . . . . . . . . . . . . . . . . . . . . .   20

    1.   <u>The Assessed Penalty is Consistent with the Internal Revenue Laws</u> . .   20

    2.   <u>The Amount of the Assessed Penalty is Consistent with the
         Intent of the Law</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

IV.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

Page

Cases:

*Abloso v. Commissioner*, No. 898-04S, T.C. Summ. OP 2006-60
   2006 WL 1028415 (Tax Ct. April 19, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,13
*Agbanc, Ltd. v. United States*, 707 F. Supp. 423, 427 (D. Ariz. 1988) . . . . . . . . . . . . . . . . . 8
*Anderson v. I.R.S.*, 442 F. Supp. 2d 365 (E.D. Tex. 2006) . . . . . . . . . . . . . . . . . . 11,16
*Caulfield v. Commissioner*, 33 F.3d 1991 (8ᵗʰ Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
*Commissioner v. Groetzinger*, 480 U.S. 23 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
*Corrigan v. Commissioner*, T.C. Memo 1994-31, 1994 WL 19093 . . . . . . . . . . . . . . . . . . 13
*Denman v. Commissioner*, 48 T.C. 439 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13
*Gang v. United States*, 783 F.Supp. 376 (N.D. Ill. 1992) . . . . . . . . . . . . . . . . . . . . . . . 20
*Gates v. United States*, 874 F.2d 584, 585-86 (8th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . 8
*Header v. Commissioner*, T.C. Memo. 2001-7, 81 T.C.M. (CCH) 987
   (U.S. Tax Court) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13
*Her v. Commissioner*, T.C. Summ. Op. 2005-187,
   2005 WL 3541193 (Tax Ct. Dec. 27, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
*INDOPCO, Inc. v. Commissioner*, 503 U.S. 79 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
*Kansas v. Cooper*, No. 00-C-1394 (Dist. Ct. of Kan., May 15, 2001) . . . . . . . . . . . . . 5,10
*Kasun v. United States*, 671 F.2d 1059 (7ᵗʰ Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
*Kersting v. United States*, 206 F.3d 817 (9ᵗʰ Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
*MDL-731 Litigation v. United States*, 989 F.2d 1290 (2d Cir. 1993) . . . . . . . . . . . . . . . . . 20
*O'Connor v. Commissioner*, T.C. Memo. 1986-444 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
*Sears v. Commissioner*, No. 7980-04S, T.C. Summ. Op. 2006-47
   2006 WL 851679 (Tax Ct. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13
*United States v. Cooper, et al.*, No. 2:04-cr-20105 (D. Kan. October 10, 2006) ) . . . . . . . . 6
*United States v. Estate Preservation Servs.*, 202 F.3d 1093 (9ᵗʰ Cir. 2000) . . . . . . . . . . 7,18
*United States v. Gleason*, 432 F.3d 678 (6ᵗʰ Cir. 2005) . . . . . . . . . . . . . . . . 11,16, 19
*United States v. Steelman*, No. 2:02-cr-20032 (D. Kan. April 12, 2002) ) . . . . . . . . . . . . . . 6
*Waltman v. United States*, 618 F. Supp. 718 (M.D. Fla. 1985) . . . . . . . . . . . . . . . . . . . . . . 20


Statutes:

Internal Revenue Code (26 U.S.C.):

   § 127(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   § 162(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 12, 18
   § 262 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17
   § 262(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   § 280A(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   § 6700 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,2,6,7,19-22
   § 6700(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
   § 6703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

1

2

Legislative Materials:

3

Pub.L.98-369, Div. A, Title I, §143(a), July 18, 1984,
   (98 Stat. 682 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Pub.L. 101-239, Title VII, §773(a), Dec. 19, 1989, 103 Stat. 2403 . . . . . . . . . . . . . . . . . . 22

Pub.L. 108-357, Title VIII, §818(a), Oct. 22, 2004,
   (118 Stat. 1584) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

S.  Rep. No. 97-494, Part I,  at *266 (July 12, 1982) . . . . . . . . . . . . . . . . . . . . . . . . . 22

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KEVIN V. RYAN
United States Attorney

JACQUELINE C. BROWN
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 7238
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-9482
Fax: (202) 514-6770
E-mail: jacqueline.c.brown@usdoj.gov
Attorneys for Defendant United States

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| STEVEN H. KASSEL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Civil No. 3:06-cv-03273-SC |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

## PRE-TRIAL BRIEF OF THE DEFENDANT UNITED STATES

The plaintiff, Steven H. Kassel, brings suit seeking a refund of moneys he has paid to the United States in partial satisfaction of a penalty assessment against him pursuant to Internal Revenue Code (I.R.C., 26 U.S.C.) § 6700. The United States counterclaims seeking to reduce to judgment the penalty assessment in the amount of $29,633. The United States will offer the admission of Mr. Kassel that he sold and participated in the promotion and sale of the TRS system. The United States will also offer the testimony of revenue agent Danny Gathright regarding his investigation into the plaintiff's conduct under § 6700. Finally, the United States will prove, by evidence, testimony, and argument that Mr. Kassel is liable for the unpaid balance of the penalty.

## QUESTIONS PRESENTED

1.     Whether the Plaintiff, Steven H. Kassel, engaged in conduct subject to penalty under 26 U.S.C. (I.R.C.) § 6700?

1     2.      Whether the Plaintiff, Steven H. Kassel, is liable for the assessed penalty of $29,633

2            pursuant to I.R.C. § 6700.

3                          STATEMENT OF FACTS

4        The United States anticipates showing the following facts at trial. From 1987 through

5 1993, the plaintiff, Steven H. Kassel, worked as a revenue officer for the Internal Revenue

6 Service. In 1993, Kassel attended training and earned an enrolled agent certificate, which

7 allowed him to represent customers before the IRS. From 1999 through December 2000, Kassel

8 worked with Renaissance, The Tax People (TTP). TTP was a firm headquartered in Topeka,

9 Kansas that promoted and sold a Tax Relief System (TRS) and other products that purported to

10 provide various methods for purchasers to lower their claimed tax liabilities. TTP was operated

11 primarily by Michael Cooper, the President; Todd Strand, the Vice-President; and Jessie Cota.

12 Kassel's primary contacts at TTP were Strand, and Lora Lee Manikam, another TTP officer.

13 The overwhelming majority of TTP customers also became Individual Marketing Associates

14 (IMAs) who sold the TRS system as a multi-level scheme.

15        TTP earned its revenue primarily from the sale of the TRS system and related services.

16 TTP sold the Platinum Tax Advantage package, which cost $300 to purchase, in addition to a

17 monthly fee of $100 for continued participation. The Platinum package consisted of the TRS

18 system and provided customers with "unlimited audit protection" and access to TTP's "experts."

19 TTP also sold other packages consisting of the TRS system, reduced audit protection, and

20 limited access to experts for reduced monthly fees. TTP marketing associates were not paid a

21 salary or compensation, but were eligible for bonuses or commissions based on the amount of

22 new customers/marketing associates they recruited to buy the TRS system. The bonuses

23 increased in a pyramid fashion as marketing associates' customers also recruited new TTP

24 customers.

25

26

27

28

The TRS system[1] included the TRS manual, The Time of Your Life, Employer's Payroll Start-Up (parts I and II), W-4 Orientation Workshop, IMA Handout for TRS Training, and various other pamphlets created by TTP for sale to marketing associates/customers. The TRS system also included a promotional videotape,[2] segments of which TTP marketing associates showed at presentations and seminars for prospective customers. The TRS system was sold by TTP marketing associates as a home-based business in and of itself.[3] As such, upon purchasing the TRS system and signing the individual marketing agreement, customers were eligible to re-sell the TRS system to other customers. Although the TRS system could potentially be purchased by a customer who did not also re-sell the product, this alternative was not offered until 2000, and in fact, the vast majority of customers were also TTP marketing associates. TTP did offer training conference calls for marketing associates, but it did not require participation in such calls to sell the TRS system.

The purpose of the TRS system was to create a home-based business - i.e. the marketing of the TRS system - and for purchasers to claim deductions based on the operation of the purported business. The TRS manual and other documents stated that customers could: 1) claim deductions related to the use of space in their home by spreading the TRS materials throughout various rooms in the home to defeat the exclusive use rule, 2) claim deductions for wages of up to $4,400 for children of ages 6-17 for their help in operating the home business, 3) claim deductions for the entire cost of health insurance and medical expenses of their families, 4) claim deductions for educational assistance payments to children of up to $5,250 per child, 5) will increase their take-home pay by employing these tax strategies, and 6) legitimize the deductions by keeping meticulous records and documenting expenses. The manual also said customers

---

[1] TTP sold various versions of the Tax Relief System from 1997 through 1999, which were called the Tax Advantage System. For 1999 and 2000, however, the primary product was the TRS.

[2] TTP included various versions of a promotional videotape with the Tax Advantage System and Tax Relief System. The videos were entitled "It's Your Choice" and "Take a Bite Out of Your Taxes."

[3] *See* Def. Trial Ex. 5, "How Many Clients May We Send You?" at 2-3.

would be "audit-proof" by following the recommended methods of documenting expenses, and that customers were guaranteed tax savings by employing the TRS methods.

The TRS system materials also state that customers could modify their Forms W-4 to get an "instant pay raise," and guaranteed customers that by following the business plan to sell the TRS system, TTP customers/marketing associates would realize a minimum of $5,000 in additional tax deductible expenses. The TTP materials state that customers they could hire their children and instead of paying an allowance, pay their children a wage and therefore claim a deduction of up to $4,400 per child. The TRS materials state that customers can claim deductions for their commuting mileage, educational assistance expenses of up to $5,250 for each child "employed" in the business. The manual states that customers can eliminate the exclusive use rule to deduct home utilities and mortgage payments, and can claim deductions for meals, vacations, and entertainment for the entire family, provided that some minimal business activity is conducted.

During his time with TTP, Kassel was involved in several aspects of marketing the TRS system as well as other activities. Kassel was featured in several TTP publications as a tax expert, and the company often touted Kassel's prior experience as a revenue officer, his appearances on television and radio programs, and his Kassel's testimony before Congress. Kassel's photograph appeared in several TTP publications and he was quoted in such publications discussing the benefits of the TRS system. Kassel used his professional experience to host a weekly conference call during which he provided substantive tax advice to TTP customers/marketing associates primarily about tax resolution issues. On some occasions, Kassel also discussed the TRS system.

Kassel participated in at least ten presentations/seminars hosted by TTP marketing associates during which he spoke to prospective and current customers about the TRS system as well as his tax representation services. In 2000, Kassel helped to re-write the TRS manual to revise much of the information provided in previous editions of the manual. Kassel also recorded a segment for the TTP promotional video that marketing associates played at

presentations and seminars for prospective customers.   Kassel also frequently participated in several Internet message boards on which he promoted the TTP organization and TRS system. On two separate occasions, Kassel sold the TRS system, including the manual, accompanying documents, and audio/video cassettes, directly to customers.

Kassel estimates that in late 1999 he spent approximately 20 to 30 percent of his time doing work for TTP.  In 2000, Kassel spent more time participating in Renaissance activities.  In late 1999, Kassel requested from TTP's president and founder, Michael Cooper, to receive some compensation for the work he performed for the company.  Specifically, Kassel requested compensation for the time he was contributing to TTP.  Cooper agreed and Kassel began receiving payments from TTP on a regular basis in Fall 1999. Kassel earned a total of $29,633 from TTP for his activities in 1999 and 2000.  Kassel was also reimbursed for travel fees and other expenses when he spoke at presentations or other TTP meetings.

In 2000, TTP created the Affiliated Tax Professionals Network (ATPN), which was a group of enrolled agents, accountants, attorneys, and other tax professionals who were to provide substantive tax advice and representation to TTP customers.  Kassel was a regional director of ATPN and became a member of TTP's National Tax Team.  TTP advertised that the National Tax Team or "Dream Team" consisted of experts on the internal revenue laws.  TTP mentioned the dream team and/or Kassel in many of its promotional materials and advertised the qualifications of its principals in order to encourage customers to purchase the TRS system and to convince customers of the validity of the tax advice offered therein.  Kassel also participated in five nationwide tax forums in which he and other TTP representatives provided information about the company and its services to tax professionals, and encouraged other tax professionals to join the organization.

On October 25, 2000, a Kansas state court entered a Temporary Restraining Order (TRO) against TTP, its founder, and other related parties, enjoining them from marketing products and services to new customers, and imposing restrictions on their business activities with existing customers. The court found that TTP  and the other defendants "committed numerous acts which

are deceptive and unconscionable acts and practices" in violation of the Kansas Consumer Protection Act, sec. 50-683 (1994). The court later permanently enjoined the defendants from conducting any business activity in or from the State of Kansas.[4] A federal grand has also indicted Renaissance, TTP, and its principals Michael Cooper, Todd Strand, and Jesse Cota for numerous offenses including: conspiracy to commit mail and wire fraud; assisting, counseling, and advising in the preparation of a false and fraudulent tax return; and defrauding the IRS, relating to their involvement in TTP. Thomas Steelman, another TTP officer, member of the tax team, and the primary author of the TRS manual, was convicted on ten counts of conspiracy to commit mail and wire fraud, and to defraud the Internal Revenue Service, and aiding and assisting in the preparation of fraudulent income tax returns. *United States v. Steelman*, No. 2:02-cr-20032 (D. Kan. April 12, 2002). Daniel Gleason, the director of the TTP tax team until 1999, was convicted on two counts of wire fraud and as well as willfully aiding, assisting, procuring, counseling, advising preparation of a fraudulent tax return. *United States v. Cooper, et al.*, No. 2:04-cr-20105 (D. Kan. October 10, 2006). Todd Strand was convicted of similar charges. *Id.* (D. Kan. March 26, 2007).

In 2003, the IRS began investigating Kassel's conduct to determine whether he was subject to penalty under I.R.C. § 6700 for his promotion of the TRS system. On or about November 5, 2005, the IRS issued to Kassel a notice of assessment in the amount of $29,633 pursuant to I.R.C. § 6700. Kassel has paid 15% of the assessed penalty.

## II. LEGAL STANDARDS

Plaintiff Kassel brings suit under I.R.C. § 6703 requesting a refund of the portion of the penalty he paid as a result of the Internal Revenue Service's assessment pursuant to I.R.C. § 6700. Section 6700 provides, in relevant part:

(a) Imposition of penalty.-Any person who-

---

[4] *See* Ex. A, Ex. A, *Kansas v. Cooper, et al.*, No. 00-C-1394 (Dist. Ct. of Kan., May 15, 2001), *available at* http://www.shawneecourt.cor/decisions/00c1394.htm.

(1) (A) organizes (or assists in the organization of)- ... (iii) any other plan or arrangement, or (B) participates (directly or indirectly) in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (A), and

(2) makes or furnishes or causes another person to make or furnish (in connection with such organization or sale)- (A) a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter, ...

shall pay, with respect to each activity described in paragraph (1), a penalty equal to the $1,000, or if the person establishes that it is less, 100 percent of the gross income derived (or to be derived) by such person from such activity.

26 U.S.C. § 6700. The statute does not require proof that a customer who purchases the plan, investment, or arrangement relied on the false statements to purchase the product. Courts interpreting the statute have found that the United States has the burden of proving by a preponderance of the evidence that the penalized person: (1) organized, assisted, or participated in the organization or sale of, any entity, plan, or arrangement; (2) made or caused to be made, false or fraudulent statements concerning the tax benefits to be derived from the entity, plan, or arrangement; (3) knew or had reason to know that the statements were false or fraudulent; and (4) the false or fraudulent statements pertained to a material matter. *See United States v. Estate Preservation Servs.*, 202 F.3d 1093, 1098 (9th Cir. 2000).

The Internal Revenue Code allows a deduction under section 162(a) for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. For an activity to be considered a taxpayer's trade or business, the activity must be conducted "with continuity and regularity", and "the taxpayer's primary purpose for engaging in the activity must be for income or profit." *Commissioner v. Groetzinger*, 480 U.S. 23, 35 (1987). Personal, living, or family expenses may not be deducted. Sec. 262(a). Thus, in order to be eligible for the deductions, a taxpayer must be able to prove that: (1) they participated in a trade or business within the meaning of section 162(a); (2) the expenses underlying the deductions were ordinary and necessary to that trade or business; and (3) the expenses were paid or

incurred. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *Abloso v. Commissioner*, No. 898-04S, T.C. Summ.Op. 2006-60, 2006 WL 1028415 (Tax Ct. April 19, 2006) (disallowing deductions claimed by purchaser of the TRS system whose sole business activity was to make monthly payments to TTP).

## III.  ARGUMENT

### A.     Kassel is subject to penalty under I.R.C. § 6700.

Kassel engaged in conduct subject to penalty pursuant to I.R.C. § 6700 by participating in the promotion and sale of the Tax Relief System and related materials, which contained statements concerning the tax benefits to be derived from the system, and which statements he knew or had reason to know were false.  The false statements pertained to material matters including the claiming of deductions and other various tax benefits by purchasers of the TRS system.  Kassel engaged in such conduct by selling the TRS system and materials to two customers and participating in presentations, seminars, conference calls, and various other activities aimed at promoting the TRS system, knowing that the TRS contained misstatements and misleading information regarding the internal revenue laws and benefits thereunder.

### 1.     Kassel participated, directly and indirectly, in the sale of the TRS system.

Plaintiff Kassel engaged in conduct subject to penalty under I.R.C. § 6700 by selling the TRS system directly to two customers and indirectly by promoting the sale of the false system to other salespeople.  Section 6700 explicitly provides that indirect participation in the sale of a fraudulent plan is subject to penalty.  *See* I.R.C. § 6700(b). *See also Gates v. United States*, 874 F.2d 584, 585-86 (8th Cir. 1989) (upholding liability of promoter who recruited agents who market an abusive tax shelters"); *Agbanc, Ltd. v. United States*, 707 F. Supp. 423, 427 (D. Ariz. 1988) (stating that "a person or entity cannot insulate itself from Section 6700 liability merely by employing salespeople who actually made the false statements.").  Although Kassel will argue that his primary role in the organization was to provide tax resolution guidance and advice, Kassel nevertheless admitted that he directly sold the TRS system on two occasions.  Kassel also participated indirectly in the promotion of the TRS system by contributing to the editing of the

TRS manual. Although Kassel is not listed as the primary author, the manual lists Kassel as a contributing editor and also details his qualifications as a former IRS employee.[5] As described above, the TRS manual was the primary component of the TRS system customers purchased.

Kassel also participated indirectly in the sale and promotion of the TRS system because he was paid to speak at TTP presentations and seminars to prospective customers, by hosting weekly and other conference calls for customers to resolve tax resolution problems as well as answer questions regarding the TRS system. In one instance, upon TTP's request, Kassel appeared along with a TTP customer in an interview requested by the criminal investigation division of the IRS to explain the TRS system.[6] Kassel also routinely e-mailed the TTP President, Vice-President, and other principals suggesting methods to modify or improve TTP's promotion of the TRS system, or to otherwise communicate his own and customer concerns.[7] Kassel knew of links to TTP materials on the TTP website that were incorrect.[8] Yet, in a public web posting, Kassel falsely stated that "the web based advertising is neither false nor misleading."[9] Furthermore, Kassel communicated with marketing associates and TTP customers on matters not related to tax resolution. Kassel engaged in such activities because he hoped to enlarge TTP's business and the sale of the TRS system, and also hoped to enlarge his own client base from among TTP customers.

Kassel also indirectly promoted the sale of the TRS system by participating on public message boards and sending e-mails in which he falsely described the tax benefits of the TRS system and the legality of the system. He also responded to questions by interested persons

---

[5] Def. Trial Ex. 6, TRS Manual at A.11.

[6] Def. Trial Ex. 17 (Bates 587).

[7] Def. Trial Exs. 15, 16, 25, 38.

[8] Def. Trial Exs. 33 (Bates 653), 51 (Bates 650), 52 (Bates 624).

[9] Def. Trial Ex. 49 (Bates 667).

regarding the operation of the TRS program.[10]  For example, in one posting, Kassel stated "I can personally back up the Tax Relief System book as I am one of the listed editors and helped to write it."[11]  In another example, Kassel e-mailed a prospective customer explaining his background with TTP and inquired "[w]hat questions can I answer for you that might cause you to have a different opinion of the company?"[12]  In several e-mails, Kassel even incorporated a promotional false statement for TTP in the signature of his e-mail correspondences that stated "Let the Nation's Leading Tax Expert show you how to cut your taxes by up to 50%. Contact Steve Kassel, EA ... for details."[13]   In various other Internet postings, Kassel falsely stated that the TRS was 100% correct.

Kassel now admits that the TRS system was in fact misleading and inaccurate, and that he knew so at the time.  Nevertheless, in 1999 and 2000, Kassel knowingly promoted and sold the TRS system and otherwise made false statements for the purpose of encouraging the sale of TRS products, which he hoped would benefit his own business.  Kassel will likely argue that he did not promote the TRS system because his primary goal and activity was to handle tax resolution matters and to represent customers in matters before the IRS.  Yet Kassel's conduct and statements prove otherwise.  Even though Kassel's primary motive for working with TTP may have been to increase his own business, he nevertheless engaged in numerous activities intended to promote the sale of the TRS system, as discussed above.[14]

> 2.   The TRS system and materials contain misstatements or omissions of law and misleading information regarding the internal revenue laws.

---

[10] Def. Trial Exs. 21, 32 (Bates 601, 652).

[11] Def. Trial Ex. 22 at 3 (Bates 605).

[12] Def. Trial Ex. 23 (Bates 611).

[13] Def. Trial Exs. 24 (Bates 614).

[14] Def. Trial Ex. 46 (Bates 648).

The TRS System marketed by TTP contains numerous misstatements of law or information otherwise likely to result in understatements of income by TTP customers.[15] The TRS system purports to convert "former ordinary home expenses into business tax deductions immediately," to "convert hobbies into deductions," and to "write off shopping trips,"[16] among various other misleading claims. Although the TTP materials do contain some statements regarding the requirement of a profit motive, the great majority of TTP materials advise customers on developing detailed documentation and records regarding the operation of their purported home-based business, rather than to pursue activities intended to result in a profit. Moreover, TTP the strategies contradict the requirement that expenses, even when legitimately incurred, be ordinary and necessary to the operation of the business and that they be undertaken with an "economic profit objective independent of tax savings." *See Sears v. Commissioner*, No. 7980-04S, T.C. Summ.Op. 2006-47, 2006 WL 851679 (Tax Ct. 2006) (disallowing medical reimbursement deductions to purported operator of TRS home-based business when taxpayer's primary business activity was to meet with old acquaintances over dinner to discuss the TRS). Courts have rejected plans similar to that marketed by Kassel and TTP. *See United States v. Gleason*, 432 F.3d 678, 683 (6th Cir. 2005) (enjoining former TTP officer for his promotion of "Tax Toolbox" in which promoter did not properly qualify that business deductions be ordinary and necessary, and misleadingly claimed that his strategies were "audit proof"); *Anderson v. I.R.S.*, 442 F. Supp. 2d 365, 372 (E.D. Tex. 2006) (finding promoter of "Tax Toolbox" liable for § 6700 penalties and noting that promoter should have warned customers that "deducting wages and medical expenses of family members through the execution of employment contracts with them 'is subject to close scrutiny and has been rejected in similar abusive tax shelter cases.'"

---

[15] *See* Ex. A, *supra* n. 4, *Kansas v. Cooper, et al.*,(issuing permanent injunction disallowing the marketing of Renaissance products and services including the TRS system because it is in violation of the Kansas Consumer Protection Laws). *See also Her v. Commissioner*, T.C. Summ. Op. 2005-187, 2005 WL 3541193 (Tax Ct. Dec. 27, 20052005) (stating that "[r]enaissance has been found to be an illegal pyramid scheme that offered no product or service other than the dissemination of fraudulent tax advice.").

[16] Def. Trial Ex. 6, TRS Manual at A.8.

(citing *Haeder v. Commissioner*, T.C. Memo 2001-7, 881 T.C.M. (CCH) 987 (2001))).  In

*Gleason*, the Court found that the requirement, under § 6700, of a fraudulent statement was met

where the plaintiff "did not properly qualify his assertions about the deductibility of weddings,

college, travel, meals, golf, cars, and everyday household expenses by stating that business

expenses must be 'ordinary and necessary' to the business ... and that personal consumption

expenditures must be 'inextricably linked to the production of income,'" as required by I.R.C. §

162(a). 432 F.3d at 683.

       The TRS system falsely advised customers that they could modify their Forms W-4 to get

an "instant pay raise."[17]  In actuality, there was no pay raise, but customers were instead advised

to merely reduce the amount of taxes withheld from their paychecks.  The "pay raise" was

purportedly attributable to lower taxes that customers would pay after implementing the TRS

system, which claim of lower taxes in turn relied on the premise that TTP marketing

associates/customers would not actually earn a profit by selling the TRS system.  Yet, if

customers earned income from selling the TRS system, as TTP promised, it would likely result

in increased tax liability for the customers.  In fact, the real purpose of the TRS system was to

advise customers on fraudulent methods to create and claim business deductions for non-

deductible personal expenses.  The TTP materials that Kassel promoted to customers falsely

advised that customers could modify their W-4s without determining the unique tax situations of

the customers.  Kassel has admitted that marketing strategy was misleading.[18]

       The TRS manual and materials that Kassel promoted also guaranteed customers that by

following the business plan to sell the TRS system, TTP customers/marketing associates would

realize a minimum of $5,000 in additional tax deductible expenses.[19]  TTP and Kassel made such

guarantee with no consideration of each customer's unique circumstances and situation to

---

[17] Def. Trial Ex. 59.

[18] *See* Def. Trial Ex. 36 (Bates 723).

[19] *See* Def. Trial Ex. 6, TRS Manual at 10.67, 10.71.

encourage customers to purchase the TRS system. In fact, not all of TTP's customers were entitled to such deductions because they did not engage in business activity for profit or otherwise did not comply with internal revenue regulations regarding the deductions they claimed. *See e.g.*, *Sears*, T.C. Summ.Op. 2006-47, 2006 WL 851679; *Abloso*, T.C. Summ.Op. 2006-60, 2006 WL 1028415.

The TTP materials that Kassel promoted falsely advised customers they could hire their children and instead of paying an allowance, pay their children a wage and therefore claim a deduction of up to $4,400 per child.[20] Compensation to one's children is deductible as a trade or business expense only if it is reasonable in amount, based on valuable and worthwhile services actually rendered, and actually paid or incurred. *See O'Connor v. Commissioner*, T.C. Memo. 1986-444; *Denman v. Commissioner*, 48 T.C. 439, 449 (1967). Yet, where a family relationship is involved, courts consider such situations with close scrutiny. *Header v. Commissioner*, T.C. Memo. 2001-7, 81 T.C.M. (CCH) 987 (U.S.Tax Ct.). Facts that militate against the deductibility of such payments include compensating the child for services in the nature of routine family chores, among other things. *Denman*, 48 T.C. at 449. As Kassel well knew, the TRS manual and materials do not explain the limitations on deducting wages to one's children and falsely state that a customer can "hire your children between the ages of 6 to 17 to work for your business, and convert the former expense of children's allowance to tax deductible wages without paying any payroll taxes."[21] The TTP materials also fail to note that no legitimate business person would employ a 6-year old child to provide $4,400 worth of marketing services.

The TRS manual that Kassel promoted also provided examples and scenarios related to the payment of purported wages to one's children.[22] The examples, however, present unrealistic scenarios that, if followed, would result in understatements of tax liability. For example, the

---

[20] *Id.* at A.7.

[21] *Id.* at A.7.

[22] *Id.* at 5.42.

manual states that a customer could hire three under-age-18 children to "answer phones, clean your office, and maintain your sample product inventory," and estimates that a customer would pay each child $4,000, an amount conveniently below the $4,400 limit after which an employer must pay employment tax. The scenarios are unrealistic because they provide no discussion of the amount of wages that would be reasonable for the few services that children would likely provide. TTP materials that Kassel promoted further advised that customers should have their children use their "wages" to pay for school tuition and other expenses usually paid by their parents, rather than use the "wages" however they saw fit.[23] Expenses such as children's tuition are personal expenses not ordinarily deductible. *See Corrigan v. Commissioner*, T.C. Memo. 1994-31, 1994 WL 19093, at *18 (disallowing as wage deductions tuition payments for the children of the taxpayer). The TTP materials do not consider that $12,000 paid to one's children would be an unusually large expense for a home-business operator only engaged in selling the TRS system. Yet, Kassel helped promotes such TRS strategies knowing that customers paying such 'wages' to their children for the listed tasks would do so only with the expectation that their children would use the "wages" to pay for education and other non-deductible personal expenses.

The TRS manual that Kassel promoted falsely advised customers that they could claim a deduction for their commuting mileage. A taxpayer, even a home-based business operator, is not allowed to take deductions for mileage and expenses related to commuting from his home to his workplace. *See Kasun v. United States*, 671 F.2d 1059, 1061-63 (7th Cir. 1982). The TRS manual falsely advised customers that by doing some work related to their home business before they leave home, the cost of commuting becomes a deductible expense. The manual cites as authority a revenue ruling providing that a taxpayer may deduct the cost of commuting to a temporary station of employment.[24] Rev. Rul. 94-47, 1994-29 I.R.B. 1. That ruling is wholly

---

[23] *Id.* at 5.42.

[24] *Id.* at 2.19.

1    inapplicable to the situation of a home-based business operator deducting the cost of commuting

2    to their usual place of business or to a location related to the operation of the home business.

3           Kassel's TRS materials also advised that customers can claim a deduction for educational

4    assistance expenses of up to $5,250 annually to children, but omitted necessary information.[25]

5    The manual provided no discussion of why a home retailer of the TRS system would want to

6    gratuitously pay the educational expenses of employees, but for the tax savings from deducting

7    clearly non-deductible expenses.  The manual also failed to explain that only 5% of the total

8    amounts an employer incurs as educational assistance payments may go towards the employer's

9    spouse or children.  Thus, an employer would have to pay at least $105,000 in total educational

10   assistance payments to qualify for a deduction of $5,250 of expenses paid to his spouse or

11   children.[26] *See* I.R.C. § 127(b)(3).

12          The TRS manual and related materials falsely state that customers can "eliminate the

13   exclusive use rule" by storing or displaying TTP promotional materials.[27]  The manual provides

14   the example that customers can take deductions for the business use percentage of their homes,

15   garage, and the barn.[28]  The manual next stated that "by having product inventory and/or product

16   samples in your residence as your sole fixed business location, you also avoid the need to

17   maintain part of your home for the exclusive use of your business."  The internal revenue laws,

18   however, provide that if a taxpayer maintains a home-based business with a legitimate intent to

19   make a profit, his is eligible for a deduction only for separately-identifiable spaces dedicated

20   exclusively to a business purpose. I.R.C. § 280A(c).  An exception allows for the deduction of

21   space used on a regular basis as a storage facility, but the exception only applies to a "separately

22   identifiable space suitable for storage."  IRS Publication 587 at 3.  Thus, the deduction would not

24          [25] Def. Trial Ex. 7, "The Time of Your Life" at 5.

25          [26] Def. Trial Ex. 6, TRS Manual at 5.47.

26          [27] TRS Manual at A.7 and 1.14.

27          [28] TRS Manual at A.7.

apply to a taxpayer's entire garage, as is implied in the TRS materials that Kassel promoted. *See* I.R.C. § 280A(c)(2).

The TRS manual, however, states the opposite in claiming that customers can eliminate the exclusive use rule. The manual also claims that homeowners can claim various other deductions such as deductions for indirect expenses such as taxes, utilities, repairs, pool service, depreciation, house cleaning, and general maintenance. Yet, the manual does not provide the legal requirement that such expenses must still be ordinary and necessary to be deductible. The TRS manual falsely advises customers that they can "audit proof" their claims to a deduction for the business use portion of a home, by taking steps to guarantee that they qualify for such a deduction.[29] TTP's claim is inconsistent with the requirements that any deductions for the operation of a business must be both ordinary and necessary because TTP states that even if customers do not need to use their home for business purposes, they should take measures to guarantee the applicability of the deduction. Courts have also rejected similar claims of "audit-proof" tax savings plans because "no tax arrangement is immune from IRS scrutiny." *Anderson*, 442 F. Supp. 2d at 372. *See also Gleason*, 432 F.3d at 683.

TTP also advised customers that they could hire their spouse or child to take advantage of deductions for health insurance and expenses. The TRS materials falsely advise customers that they could pay their spouses a minimum wage for their employment in order to incur less social security and medicare taxes, but to still reap the advantages of health insurance deductions. The strategies TTP advises are wholly inconsistent with the internal revenue laws, which require that compensation to employees be commensurate with the services actually provided, rather than simply structuring employee wages in order to take most advantage of tax deductions.

---

[29] TRS Manual at 9.60.

The TRS manual stated that customers claim deductions for meals and entertainment expenses, including activities "relating solely to the taxpayer or the taxpayer's family."[30] Customers engaging in the limited promotion of the TRS system would never have a reasonable and legitimate expectation of future business opportunities sufficient to justify the cost of meals and entertainment for the entire family. Yet TTP materials further advised that customers could claim deductions for their personal vacations as long as they pursue some business activity while on vacation, and deductions for the cost of medical insurance and expenses of the family "employees." As described above, such deductions are wholly inconsistent with the requirements that business deductions be ordinary and necessary. A reasonable operator of a business would not incur the cost of an entire family vacation merely for the opportunity to pass out business cards and engage in other minimal promotional activities. Similarly, a business owner would not likely pay for all of the health insurance and medical expenses of employees but for the deductions applicable. Such expenses are neither ordinary nor necessary, as required by the internal revenue laws. Moreover, such expenses are distinctly personal expenses ordinarily disallowed under I.R.C. § 262.

It is apparent from the TTP products as a whole that the main focus of the operation was to promote improper tax deductions rather than to actually encourage customers to make a profit. The TRS manual, and accompanying videotape and materials, advertise that by selling the TRS system as a home-based business on a "very part-time basis," customers were eligible to claim thousands of dollars worth of deductions, even though TTP and Kassel knew that such customers would not make a profit if they had actually spent the amounts claimed on the tax returns. The vast majority of the TRS manual is dedicated to false statements about tax benefits, rather than explanations of genuine marketing methods. The examples demonstrate TTP's focus.[31] The manual lists several ways to deduct expenses for wages paid to one's children, but offers limited

---

[30] *See* TRS manual at 4.35.

[31] Def. Trial Ex. 6, TRS manual at 3.30-3.31.

information on services children can provide with the intent of improving the customers' businesses. Other examples in the videotape and manual provide unrealistic figures, such as statements that customers can claim deductions for $9,000 for two vehicles, $4,000 for travel and entertainment, and $8,600 for wages. The examples TRS provided are not realistic for expenses related to the sale of the TRS system, and were designed to cause customers to overstate such deductions when preparing their tax returns. Kassel has admitted that these examples were misleading.[32] In addition, though TTP fraudulently advised customers that they should take thousands of dollars worth of deductions from hiring children and spouses as employees, and by spreading TTP materials around the house, the TTP videotape stated that the TRS home business had low start-up costs and overhead expenses and that customers "won't need employees or a big inventory of products."[33]

Finally, the TRS system that Kassel promoted advised customers to take deductions with no regard to the fact that such deductions must be ordinary and necessary expenses paid to promote the functioning of a legitimate home-based business. I.R.C. § 162(a). Instead, TTP advises customers to structure their payments and accounting systems merely to take advantage of tax deductions for purported business expenses, rather than to legitimately promote any profitable enterprise. Applying the TTP strategies that Kassel promoted, a small business owner could not reasonably make a profit by paying children wages of up to $4,000 each, paying all of the medical expenses and insurance costs of employees, paying as much as $105,000 for educational assistance reimbursement, and by paying the costs of all of the other deductions described in TTP materials. The TRS system provided inaccurate information regarding the tax laws.

3. <u>Kassel knew the TRS system was incorrect and misleading.</u>

---

[32] *See* Def. Trial Exs. 27, 36, 37.

[33] *See* Def. Trial Ex. 35 at 12.

Kassel is a well-educated tax professional who knew or had reason to know that the tax advice and documents TTP distributed was false and misleading. Kassel is a former IRS revenue officer and the owner of his own tax representation firm, and, as TTP advertised, is a self-proclaimed "expert" in the tax field. Kassel's education and experience is relevant to determine whether he had or should have had knowledge of the falsity of the statements for purposes of I.R.C. § 6700. *See Estate Preservation,* 202 F.3d at 1103; *Gleason,* 432 F.3d at 682.

Kassel himself has admitted that he knew that the TRS system he helped to promote was not consistent with the internal revenue laws. Kassel acknowledged that he was "horrified" by the first TRS presentation he attended because of the inaccuracies in the TTP presentation. Kassel knew that the examples, videos, and materials presented by the TTP marketing associates were inaccurate and misleading. Kassel knew of numerous problems with the TRS system that could cause TTP customers to claim deductions in a manner inconsistent with the internal revenue laws. For example, Kassel was skeptical of the implications of TTP's advice to customers that they modify their Forms W-4 to get an "immediate pay raise." Kassel also knew the inaccuracy of TTP's claim that customers could eliminate the exclusive use rule, and its claim that customers could claim deductions for unreasonable wages paid to children.

Kassel also knew that during their presentations, TTP marketing associates and principals made inaccurate and false statements regarding the internal revenue laws and the benefits of the TRS system, because he attended several meetings and listened to several of the training calls TTP held.[34] Nevertheless, Kassel continued to appear at such presentations.

Kassel's e-mails and other statements demonstrate that he knew the TRS manual and other aspects of TTP's marketing thereof to be misleading. As late as December 2000, Kassel knew that TTP's old marketing videotape contained misstatements about an "instant pay raise", and knew that it was still accessible to customers on the TTP website.[35] Separate from the

---

[34] *See* Def. Trial Ex. 34 (Bates 663).

[35] *See* Def. Trial Ex. 33 (Bates 653).

problems with the more recent TTP materials, Kassel also knew that previous information TTP had distributed, and still made available to customers, contained more misleading information, such as failing to emphasize the need of a profit motive in operating a home business.[36]  Kassel knew TTP falsely advertised that the TRS system was endorsed by Congress or the IRS.[37]  Despite knowing of the misleading and inaccurate information TTP was disseminating, Kassel continued to help promote and sell TTP products and give his blessing to the scheme in promotional appearances.  He also continued to benefit financially from such promotion until Fall 2000.

>    **B.    The Assessed Amount of the Penalty is Correct.**

>    1.    <u>The assessed penalty is consistent with the internal revenue laws.</u>

The penalty the IRS assessed is consistent with the letter and intent of I.R.C. § 6700. While the United States has the initial burden of proving that a person has engaged in conduct subject to penalty under section 6700, the taxpayer has the burden of proving that the amount of the penalty, once assessed, is incorrect. *See Kersting v. United States*, 206 F.3d 817, 820 (9th Cir. 2000); *Caulfield v. Commissioner*, 33 F.3d 991, 993 (8th Cir. 1994); *In re: MDL-731 Litigation v. United States*, 989 F.2d 1290, 1297 (2d Cir. 1993).  Section 6700 provides that the amount of a penalty is the lesser of  $1,000 for each activity subject to penalty, or if the taxpayer establishes that it is less, 100 percent of the gross income derived by such person from the prohibited activity. I.R.C. § 6700(a).  The prohibited activity is the direct and indirect participation in a sale. *See Waltman v. United States,* 618 F. Supp. 718, 720 (M.D. Fla. 1985).

The IRS assessed Kassel a penalty of $29,633 based on his direct and indirect promotion and sale of the TRS system in 1999 and 2000.  Because Kassel engaged in more than thirty separate acts subject to penalty under I.R.C. § 6700, the IRS determined the penalty based on the $29,633 in gross income Kassel received from TTP for 1999 and 2000.  The $29,633 is less than

---

[36] *See* Def. Trial Ex. 41 (Bates 811).

[37] *See* Def. Trial Ex. 38 (Bates 733).

an assessment of $1,000 for each "activity" subject to penalty. *See Gang v. United States*, 783 F. Supp. 376 (N.D. Ill. 1992) (recognizing that 1989 amendment to § 6700 provides for $1,000 penalty for each "sale or organizational activity.").

Kassel engaged in numerous activities subject to penalty. First, Kassel admits that he made two direct sales of the TRS system, which necessarily involved distributing TRS materials containing false statements. Though Kassel claims that he did not make direct sales because he only sought to do tax representation work, Kassel nevertheless stated that he "rarely makes direct sales because of time constraints."[38] Kassel admitted that he allowed TTP to use his name and likeness on numerous TTP distributions intended to encourage prospective customers to purchase the TRS system, including the Tax Chat newsletter, the TTP promotional videotape, the TRS manual, and other publications. Kassel also contributed to the editing of the TRS manual and participated in the creation of the TTP videotape, which contained false statements that were distributed to numerous customers and marketing associates nationwide. Kassel also participated in conference calls where he also provided substantive information on the TRS system.

Kassel also participated in TTP seminars and presentations promoting the TRS system. Some TTP seminars included playing the TTP videotape, which Kassel knew to contain inaccurate and misleading information. Kassel admits that he participated in over ten such presentations or seminars during his years with TTP. Lastly, Kassel participated in five tax forums at which he and several other members of ATPN distributed TRS promotional material to other tax professionals.[39] Kassel engaged in such conduct to help promote and sell the TRS system. Kassel profited from all of his promotional activity, in the amount of $29,633, which the IRS determined to be the proper penalty amount, because it is less than the applicable total penalty computed on a $1,000 per statement basis.

---

[38] *See* Def. Trial Ex. 26 (Bates 620).

[39] TRS *See* Def. Trial Ex. 20 (Bates 599).

2.    The Amount of the Assessed Penalty is Consistent with the Intent of the Law.

The amount of the penalty the IRS assessed against Kassel is also consistent with the policy underlying the penalty statute.  Since 1982 when I.R.C. § 6700 was enacted, Congress has amended the statute several times to increase the penalty assessed when a person has engaged in conduct subject to penalty.[40]   In 1989, Congress amended I.R.C. § 6700 to provide for a penalty of the lesser of $1,000 for each incidence of penalty conduct or 100% of the participant's gross income derived from such activity.[41]  Congress allowed for increased penalties in recognition of the great amount of profits that promoters were realizing from conduct subject to such penalties.  In addition, Congress sought to impose the penalty not only on those promoters who directly sell improper tax schemes, but also those who indirectly orchestrate and promote the sale of such products.[42]  Otherwise, a promoter could potentially shield himself from penalty under the statute merely by having others make direct sales of the infringing products.  Here, for example, if the penalty did not apply to conduct beyond direct sales of the product, the persons responsible for the conception, planning, and marketing of the TRS system would not be liable for any penalty unless they directly sold the product to specific customers.  The $29,633 penalty assessed against Kassel is therefore appropriate because he received the $29,633 for his activities and conduct aimed toward increasing the sales of the TRS system.

Kassel, as a former IRS officer and experienced enrolled agent, knew that the TRS system, that he gave his blessing to when promoting it, was inconsistent with the law and would

---

[40] In 1984, Congress amended the statute to allow for up to 20% of a participant's gross income from penalty conduct. P.L. 98-369, Div. A, Title I, § 143(a), July 18, 1984, 98 Stat. 682. In 1989, the statute was further amended to provide for the 100% penalty applicable here. P.L. 101-239, Title VII, § 7734(a), Dec. 19, 1989, 103 Stat. 2403.

[41] Pub.L. 108-357, Title VIII, § 818(a), Oct. 22, 2004, 118 Stat. 1584.)

[42] *See* S. Rep. No. 97-494, Part I, at *266 (July 12, 1982) ("The committee believes that the penalty provisions of present law are ineffective to deal with the growing phenomenon of abusive tax shelters. Abusive tax shelters must be attacked at their source: the organizer and salesman.").

cause customers to claim unlawful deductions. Kassel nevertheless participated in the marketing and promotion of the TRS system because he could profit from promoting it.

One purpose of the § 6700 penalty is to deter those engaging in penalty conduct from future violations. Kassel knowingly participated in the active promotion of an unlawful and misleading tax scheme for at least one year. Though he only made two direct sales of the TRS system, he participated in numerous activities to encourage further sales of the TRS system, and in so doing made numerous false statements subject to penalty.

## IV. CONCLUSION

At the conclusion of the trial, the United States will request that the Court find in its favor both that Kassel has engaged in conduct subject to penalty under I.R.C. § 6700 and that the penalty amount assessed is proper.

Respectfully Submitted,

KEVIN V. RYAN
United States Attorney


 s/ Jacqueline Brown
JACQUELINE C. BROWN
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 7238
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-9482

Dated: March 26, 2007

CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Pre-Trial brief of the Defendant United States has been made upon the following by depositing a copy in the United States mail, postage prepaid, this 26th day of March, 2007.

Mark C. Watson
The Law Offices of Mark C. Watson
1633 Bayshore Highway, Suite 341
Burlingame, CA 94010

_s/ Jacqueline Brown_
JACQUELINE C. BROWN
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 7238
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-9482