## IN THE DISTRICT COURT OF SHAWNEE COUNTY, KANSAS
### DIVISION TWO

STATE OF KANSAS, *ex rel.*,                    )
CARLA J. STOVALL, Attorney General,            )
                                               )
        Plaintiff,                          )
                                               )
vs.                                            )    Case No. 00-C-1394
                                               )
MICHAEL C. COOPER, Individually;               )
and d/b/a ADVANTAGE INTERNATIONAL             )
MARKETING and d/b/a RENAISSANCE               )
HOLDING CORP. and d/b/a RENAISSANCE OF        )
NEVADA; RENAISSANCE TTP, INC. f/k/a           )
RENAISSANCE DESIGNER GALLERY                   )
PRODUCTS INC. d/b/a THE TAX PEOPLE a/k/a       )
The Tax People.net and d/b/a ADVANTAGE         )
INTERNATIONAL MARKETING, INC. a/k/a            )
ADVANTAGE INTERNATIONAL MARKETING             )
CORPORATION a/k/a ADVANTAGE                    )
INTERNATIONAL MARKETING;                       )
ADVANTAGE INTERNATIONAL                        )
MARKETING, INC., a/k/a ADVANTAGE              )
INTERNATIONAL MARKETING                        )
CORPORATION a/k/a ADVANTAGE                    )
INTERNATIONAL MARKETING, a wholly             )
owned subsidiary/division of RENAISSANCE      )
TTP, INC.; and John or Jane Does 1-50,         )
                                               )
        Defendants.                        )
                                               )

## MEMORANDUM DECISION AND ORDER OF TEMPORARY INJUNCTION

On October 19, 2000, plaintiff State of Kansas on the relation of Carla J. Stovall, Attorney General, filed this action against defendants Michael C. Cooper, Renaissance TTP, Inc., Advantage International Marketing, Inc., and others unnamed, alleging that defendants have committed deceptive and unconscionable acts and practices in violation of the Kansas Consumer Protection Act, K.S.A. 50-623 *et seq*. The state claims defendants operate an illegal pyramid referral sales scheme and have knowingly and willfully misrepresented and concealed from consumers material facts about the product, services and business opportunity which they sell to consumers. On October 25, 2000, the parties stipulated to the entry of a Temporary Restraining Order. Among other things, the Temporary Restraining Order restricts defendants from marketing products and services to new customers and imposes conditions on the continuation of business with existing customers. The state now requests that the Court enjoin defendants from transacting any business during the pendency of this action.

### OPINION

Because the state has proven that defendants have committed deceptive acts and practices in violation of the Kansas Consumer Protection Act, K.S.A. 50-623 *et seq*., the Court concludes

State of Kansas vs. Michael Cooper d/b/a Renaissance TTP, Inc. - MD&O        Page 2 of 26

Case 3:06-cv-03273-SC    Document 28-1    Filed 03/26/07    Page 2 of 26

defendants should be enjoined from transacting any business in or from the State of Kansas. Since October, 1997, defendants have operated an illegal pyramid referral sales scheme and have committed numerous deceptive acts and practices in promoting their business opportunity to consumers. Defendants have seduced consumers into joining their illegal pyramid scheme through the use of specious guarantees of tax deductions and savings, false assurances of legality, and misleading promises of unlimited income opportunity. The linchpin of defendants' illegal scheme is the Tax Relief System and Prepaid Tax Advantage, which consumers are required to purchase as a condition of becoming eligible for and maintaining position in defendants' commission plan. By paying for the right to have a position in the company and in return for recruiting others, consumers are promised lucrative future compensation without any caveat or disclosure that only those few initial participants at the top of the pyramid could likely achieve projected financial results. From its inception, defendants' marketing scheme has expanded primarily through the recruitment of participants who pay defendants money in return for which they receive the right to sell products and services and the right to receive in return for referring other participants into the program rewards which are unrelated to the sale of products and services to the ultimate consumer. Contrary to defendants' arguments, the Court has not been persuaded that defendants implemented fundamental policy changes in August, 2000, which, if followed, should permit the defendants to continue to conduct business. Based on the entirety of the credible evidence, the Court concludes defendants have violated the Kansas Consumer Protection Act and if permitted to continue to conduct business in Kansas, would likely continue violating the Act. Therefore, a temporary injunction will issue enjoining defendants from conducting all business in this state during the pendency of this action.

## FINDINGS OF FACT

1. Michael C. Cooper is the founder, majority shareholder, director and chief executive officer of Renaissance TTP, Inc. (Renaissance). In promotional materials, Mr. Cooper is described as "a marketing genius who has taken companies to over $100 million in annual sales and is a current MENSA member." The only substantial evidence produced about Mr. Cooper's prior marketing experience was that one multilevel marketing scheme ended with the entry of a Consent Judgment in accordance with provisions of the Kansas Consumer Protection Act. On April 30, 1996, Mr. Cooper entered into a Journal Entry of Consent Judgment in *State of Kansas, ex rel. Carla J. Stovall, Attorney General v. Truly Special, Inc., et al.*, In the District Court of Shawnee County, Kansas, Case No. 94-CV-1429. As a condition of the Consent Judgment, Mr. Cooper agreed to "refrain from and be permanently enjoined from engaging in any and all deceptive and/or unconscionable acts and practices in violation of the Kansas Consumer Protection Act, K.S.A. 50-623 *et seq.* ..."

2. Mr. Cooper started his present business under the name Renaissance Designer Gallery Products, Inc. (RDGP) Mr. Cooper incorporated RDGP in Nevada on June 17, 1995. RDGP applied for authority to engage in business in Kansas in August, 1995. On its application as a foreign corporation, RDGP described its business as the "marketing of fine jewelry, collectibles and antiquities." Restated Articles of Incorporation were filed in Nevada on February 3, 1997. A certificate of amendment was filed April 13, 1999 changing the name of the corporation to Renaissance TTP, Inc.

3. In October, 1997, Mr. Cooper began marketing "The Tax Advantage System" (TAS) through Advantage International Marketing (AIM), a Division of Renaissance Designer Gallery Products, Inc. The marketing strategy, as stated in the AIM Business Plan, was to "aggressively promote the Tax Advantage System, our products, and our overall business opportunity on a nationwide basis through our retail customers, friends, relatives, business associates, and new prospects...."

4. The AIM Independent Marketing Associate Application & Agreement, Form A100 (10/97) offered the Tax Advantage System, the Business Consultant Pack and the Prepaid Tax Advantage. The TAS included a "free sales kit, complete ($495.00 retail price) Home Advantage Tax System (HATS), training workbook, audio training tapes, expense logs, filing system labels, free Renaissance Membership and Business plan, product catalogs, price sheets and order forms (Associate cost $300.00)."

5. The Business Consultant Pack consisted of four Home Advantage Tax Systems and four Renaissance memberships. The retail value was listed as $2,380. The potential retail profit was claimed to be $1,180. The Independent Marketing Associate's (IMA's) cost for the Business Consultant Pack was $1,200.

6. The "Prepaid Tax Advantage" was priced at $100 per month in the AIM IMA Application and Agreement. The order portion of the application has a pre-printed check mark next to the "Prepaid Tax Advantage" description. The Prepaid Tax Advantage included "unlimited live and interactive weekly tax training and unlimited questions and answers on any tax questions with nationally known tax experts, the Tax Free News monthly newsletter and the 2% National Audit Defense Fund." The 2% National Audit Defense Fund is described in Section 12 of the TAS workbook. AIM proposed to provide up to $250 to reimburse the purchaser's local accountant or agent appearing at an IRS audit of the purchaser's "personal return reporting expenses for your AIM home business." AIM also promised to reimburse up to $60 for the tax appeal filing charge as well as to provide free consultation with AIM's team of tax experts on how to win the appeal. Payment for the Prepaid Tax Advantage was arranged by automatic bank draft or credit card.

7. A second version of the Tax Advantage System was marketed between May, 1998, and March, 1999. The IMA Application and Agreement Form, L100 (5/26/98) offered the TAS, Business Consultant Pack, and Prepaid Tax Advantage. Again, the Prepaid Tax Advantage box on the order form has a pre-printed check mark. The product and services are essentially the same as the first version of the TAS, except the Prepaid Tax Advantage added Free 1040 Preparation and the 16th Amendment Newsletter. The second generation TAS also includes several testimonials from tax professionals endorsing the TAS. A single sheet titled "The Most Sellable Product in America" suggesting "unlimited Audit Protection (includes prior years)" is included, but the TAS workbook, which is the same workbook offered in the first version of the TAS, only describes reimbursement for up to $250 if the purchaser is notified of an IRS audit of the purchaser's personal return reporting expenses for the purchaser's "AIM home business."

8. A third version of the TAS was produced in or about March, 1999, but was renamed the "Tax Relief System" (TRS). The TRS was marketed from March, 1999, through at least August, 2000. The TRS had essentially the same components as the TAS, with a few exceptions. A "W-4 Exemption Increase Estimator" and related pamphlet "Your Immediate Pay Raise Enclosed" was added. The audit protection was now described as "unlimited audit protection." The protection apparently was expanded beyond TAS protection to cover personal or business audits. In addition, the audit protection was not limited to audits related to expenses reported for the purchase of the AIM home business. For audit protection, Renaissance promised intervention of the "Tax Dream Team" and retroactive protection.

9. In the TRS workbook, Renaissance claimed several benefits attached to participation in the Prepaid Tax Advantage. Renaissance claimed the Prepaid Tax Advantage was prima facie evidence of

State of Kansas vs. Michael Cooper d/b/a Renaissance, TTB Inc.   Page 4 of 26

Case 3:06-cv-03273-SC   Document 28-1   Filed 03/26/07   Page 4 of 26

being in business for profit, which combined with the Business Plan (provided free), meant that the IMA's deductions were "audit proof." Further, Renaissance stated the Prepaid Tax Advantage program provided increasingly lucrative monthly residual income. Renaissance claimed that participation in the Prepaid Tax Advantage program offered a "built-in retention factor." In this regard, Renaissance explained that if the customer dropped out of the Prepaid Tax Advantage program the customer may lose home-based business deductions. The same claim was made in earlier TAS versions of the Prepaid Tax Advantage program, but was stated in stronger language. Earlier versions suggested that cancellation of the Prepaid Tax Advantage program would cause loss of membership in Renaissance, IMA status and would cause the customer to "lose their home business deductions."

10. In regard to retention of IMAs, Renaissance, upon attempted withdrawal of the IMA from the Prepaid Tax Advantage program, reminded the IMA that continuous participation was required to maintain position in the company and warned that withdrawal could cause the IMA to lose home business deductions. This practice related to retention of IMAs has been consistently employed by Renaissance with regard to IMA withdrawals.

11. The Independent Marketing Associate Application and Agreement, Form L100 (7/14/99), which was used with the third revision of the TRS provided that: "purchase of the TRS required $300 down and $100 per month." The TRS was described as a "turnkey system." An IMA was required to participate in the Prepaid Tax Advantage program. A corporate funding option was available and four TRSs were made available as the "Founder's Pack." By purchasing the Founder's Pack the IMA could establish a business center in the compensation structure.

12. The commission plan operated by Renaissance prior to August, 2000, is described on pages 22 and 23 of the pamphlet, "It's Your Money, Not TheIRS." This pamphlet was used to promote the first TRS. Mathematical examples based upon the ability to recruit others into the system are used to show how profits may multiply geometrically as the organizational structure grows and pyramids. Under the section Six Ways to Get Paid, it is explained to the prospect that sales bonuses are paid for sales of the TRS and monthly Prepaid Tax Advantage. Direct sales bonuses were paid daily for TRS sales. Binary and trinary bonuses were paid weekly for sales by IMAs who were downline. Renaissance claims that "each business center can make $4,500 per week on this bonus alone." The "Prepaid Tax Advantage (PTA) Bonus" was paid monthly. The bonus pay for each downline representative was $3.00. Examples for referring representatives into the plan show that the possible PTA bonus increases geometrically. Pay on level 7 is represented to have a possible cumulative per month bonus of $9,837. Other illustrations such as "You Do The Math" and drawings of circles with related calculations representing the potential for substantial income were distributed to prospects.

13. Renaissance contends the Court should not consider relevant the company's marketing of products or services before August, 2000. Renaissance asserts such an evaluation is not relevant on the issue of whether prospective injunctive relief should be ordered because it substantially changed its marketing policies, practices and procedures in August, 2000. According to Renaissance the August, 2000, modifications bring the company's marketing practices in line with criteria established in *In the Matter of Amway Corporation, Inc.*, 93 FTC 618 (1979), which indicate legitimacy of a network marketing program. While the Court does not accept Renaissance's contention as to the relevancy of pre-August, 2000, practices, the Court does agree that post-August, 2000, practices must be carefully examined on issues relating to the scope of an injunctive remedy. Accordingly, the Court will examine the modifications which Renaissance claims were made to its marketing program, product, services and commission plan.

State of Kansas vs. Michael Cooper d/b/a Renaissance TT..Inc. - MD&O

Case 3:06-cv-03273-SC   Document 28-1   Filed 03/26/07   Page 5 of 26   Page 5 of 26

14. The most recent version of the Tax Relief System was marketed between August, 2000, and October 25, 2000, when the Temporary Restraining Order was entered. The most recent TRS, like earlier products, was packaged in a plastic clamshell binder. The TRS includes a manual, business and benefit plans, policies and procedures, a price list for tax preparation, information on calculating and adjusting W-4 withholdings, audio cassette tapes, forms and a record keeping system. The binder also contains merchandise catalogues.

15. The TRS describes basic home-based business tax strategies and business expense deductions. The manual provides citations to the Internal Revenue Code, treasury regulations, revenue rulings and Internal Revenue Service publications, as authority for the deductions explained in the TRS. The audio-tapes explain home-based business tax strategies, suggest that tax advantages are available to home-based business entrepreneurs, and promote the TRS, which is referred to in the audio-tape promotional material as the "business in a box."

16. The Court finds that all versions of the Tax Advantage System and Tax Relief System offered to consumers between October, 1997, and October, 2000, contain substantially the same components, information and material. The workbooks all describe business deductions which may be available to home business operators, audio cassette tapes which explain deductions and promote products and tax strategies, and various promotional materials. The format of the workbook presentation is simplistic. The workbook contains some inaccurate information. Overall, however, the workbook accurately provides basic information about potential deductions available to home-based business entrepreneurs. The basic information in the workbook may be useful to consumers wanting to learn about possible home-based business deductions and strategies.

17. Since August, 2000, Renaissance claims it has offered four tax services under its Platinum Tax Advantage Program, formerly the Prepaid Tax Advantage program. Renaissance describes these services as "access" to tax advice and audit representation. These services are marketed to individuals and businesses. The subscription price for the individual tax advice and audit representation services is $10 and $20 per month respectively. The subscription price for the business tax advice and audit representation services is $30 and $40 per month respectively. Subscribers may enroll in the Platinum Tax Advantage (PTA) for $100 per month. These subscribers receive all four monthly individual and business advice and audit services. The tax service subscriber receives publications and is entitled to participate in regular telephone conference calls. The subscriber may obtain advice from the Renaissance National Tax Team during the telephone conference calls.

18. The tax services under all programs have included advice and audit representation components. The advice services have remained essentially consistent from the beginning. The Affiliated Tax Professional Network services were added in August, 1999. The audit representation feature now has expanded coverages. The Renaissance claim that it has significantly changed its tax services under the new name Platinum Tax Advantage, however, is contradicted on audio-tape six of the current version of the TRS. On the audio-tape, the PTA service is still referred to as the Prepaid Tax Advantage, remains priced at $100 per month and, being described as the "heart and soul" of the Renaissance business, still purports to pay a monthly $3.00 commission on the Prepaid Tax Advantage.

19. Subscribers to the audit representation service are entitled to audit representation before the Internal Revenue Service by the Renaissance National Tax Team (NTT). The audit representation is retroactive to three years before the date of subscription. Renaissance claims in its promotional materials that "[b]ecause of their extensive knowledge of the tax code, the Tax Team has never lost an

audit, and the majority of the time has had more money refunded at the end of an audit...!" In the book, The Result is Money, which was published in February, 2000, and is referred to in the present TRS audio-tapes, Tom Steelman, a member of the NTT, is quoted on page 191 saying: "We have won all cases involving taxpayers and the IRS. We expect to continue to do so."

20. Since July, 1999, Mr. Jesse Cota, Renaissance's National Director of Taxation, estimated Renaissance had provided representation in 200 audits. Approximately 100 audits had been completed. According to Mr. Cota, 41 audits resulted in no change or a refund. No evidence has been presented concerning the period covered by any audit or the reason for any adjustment. No evidence has been offered about audits resulting in any assessments. No evidence was offered to explain whether audit representation was provided under the current audit program or under the more limited benefits explained in the TAS version of the audit program.

21. The representations by Renaissance about its audit success are false. The false representations have been communicated in numerous promotional materials distributed to consumers from October, 1997, through the present.

22. The National Tax Team consists of six tax professionals who are represented to have extensive tax backgrounds. In its Fast Track Training Manual for IMAs and in other promotional material, the NTT is referred to as "The Tax Dream Team" or the "Million Dollar Tax Team."

23. Tax services at reduced rates are also provided to participants in the Platinum Tax Advantage through the Renaissance Affiliated Tax Professional Network (ATPN). Renaissance began developing its ATPN in August, 1999. The ATPN is composed of independent tax professionals. The ATPN members have various tax credentials. Members may be lawyers, accountants, IRS enrolled agents, former IRS employees or tax preparers. These tax professionals are available to advise subscribers regarding tax strategies and tax return preparation. Renaissance claims that any tax professional admitted to the ATPN must qualify through examination and satisfaction of Renaissance criteria. ATPN members are used to validate Renaissance products for marketing purposes.

24. According to Mr. Cota, who was a former District Director for the Internal Revenue Service and who, as stated, is now Renaissance's National Director of Taxation, Renaissance had approximately 540 ATPN members at the time of trial. However, Renaissance, as late as October 16, 2000, represented on its website that thousands of tax firms had affiliated with the Company through the ATPN. In February, 2001, Renaissance was still claiming 1877 ATPN affiliates. Other promotional materials, including Shazaam! newsletters and audio-tape seven of the current TRS, misrepresent the number of tax professionals affiliated with Renaissance.

25. The representations by Renaissance about the size of its ATPN network are false. The false representations have been communicated in numerous promotional materials from at least February, 2000, through the present.

26. ATPN members must pay Renaissance a referral fee of 5% to 10% of revenues from prospects referred by IMAs. ATPN members receive memberships in Renaissance at no charge in return for endorsing the Tax Relief System. As stated, Renaissance uses endorsements of ATPN members to validate the marketing of the TRS.

27. The ATPN member is required to purchase the Platinum Tax Advantage (or the former Prepaid Tax Advantage) before being eligible for commissions from sales to the ATPN member's clients.

State of Kansas vs. Michael Cooper d/b/a Renaissance-TTB, Inc. - MD&O   Page 7 of 26

Case 3:06-cv-03273-SC   Document 28-1   Filed 03/26/07   Page 7 of 26

ATPN members are told IMAs will bring in revenues from $100 to as much as $400-500 per tax return. By selling the Prepaid Tax Advantage and Platinum Tax Advantage programs to clients, the ATPN member has been told he or she may earn residuals and bonuses under the Renaissance compensation plan.

28. In its current promotional literature Renaissance distinguishes active from other IMAs. Since August, 2000, Renaissance has described "active" IMAs as those who market and sell its products and services and are eligible to participate in commissions as distinguished from IMAs who buy the TRS and subscribe to some of its tax services. In prior versions of the program the distinction appears to have been ignored by Renaissance. Under its programs offered between October, 1997, and August, 2000, each customer signed an IMA application and agreement.

29. Since August, 2000, Renaissance states that "active" IMAs have earned compensation by selling the TRS and monthly tax services to others. IMAs also earn compensation from the sale of the TRS and monthly tax services by other IMAs whom they have recruited to build a downline system. Renaissance has an elaborate commission program described as direct, trilogy, binary and residual sales commissions. Since August, 2000, Renaissance states it has used a retail sales requirement in its commission plan.

30. In order to be and remain eligible for commissions a IMAs have been required to participate in the Prepaid Tax Advantage or Platinum Tax Advantage. Under all versions of the TAS and TRS participation in the compensation plan required payment of $100 per month by the IMA as a condition of eligibility for compensation. As pointed out, even ATPN members have been required to pay the fee for the Prepaid Tax Advantage and Platinum Tax Advantage as a condition for participation in the Renaissance compensation plan.

31. Under its present compensation plan, Renaissance explains that an IMA becomes eligible for commissions by first, selling a TRS, and second, establishing a retail center. A retail center is described by Renaissance as a business unit that generates retail sales of products and services and a computer accounting unit that tracks the retail sales volume of products and services. The retail center includes three additional retail centers that the IMA may qualify only if sales volume reaches a predetermined level.

32. According to Renaissance, a retail center is qualified, and an IMA becomes eligible for commissions, when the IMA sells within a given month at least one TRS and at least $100 in monthly tax services. The IMA earns trilogy commissions when all three additional retail centers accumulate a predetermined volume of TRS and monthly tax service sales volume. If only two of the additional retail centers generate a predetermined volume of sales of the TRS and monthly tax service sales volume, the IMA earns a binary commission. Provided sales volume meets a predetermined level, the sales volume may be derived from two or three retail centers. If the retail sales volume differs between each of the three additional retail centers, the highest level of sales achieved by two or three retail centers determines the commission amount.

33. Under its current plan, the retail sales commission is calculated and posted by Renaissance at the end of each business day, and a commission check is transmitted to the IMA one week after the day of the sale. Residual sales commissions are paid monthly and determined by the volume of monthly tax services sold by an IMA. IMAs may retain the benefit of excess sales volume, which will carry forward until the IMA earns the maximum $100 binary or trilogy bonus for that retail center. Thus, Renaissance points out IMAs accumulate and do not forfeit the sales volume attained by the

retail center.

34. Prior to August, 2000, Renaissance had no retail sales requirements as prerequisites to earning commissions under Renaissance compensation plans. IMAs earned commissions primarily by recruiting others into the marketing scheme, not from sales to retail consumers.

35. Under its present compensation plan Renaissance claims IMAs do not receive a referral fee, commission or royalty by recruiting additional IMAs. Under its compensation plan in effect before August, 2000, however, the Prepaid Tax Advantage Bonus program clearly provided for monthly commission based upon the number of IMAs recruited into the program who were required to pay Renaissance $100 per month in order to maintain position in the compensation plan. Renaissance claims that until the State brought this action, Renaissance had not missed a single commission payment to IMAs. No evidence otherwise has been presented.

36. Ray LaPietra enrolled as an IMA in March, 1999. Mr. LaPietra was persuaded to join Renaissance because he saw significant income opportunities in being able to build an organization. Mr. LaPietra had a good certified public accountant so he did not need tax advice. He described the program as the most generous compensation program he had ever seen. Mr. LaPietra was provided a drawing by Paul Yancey, his sponsor. The diagram consisted of circles on a piece of paper and mathematical projections of income potential. LaPietra testified that the circles meant people sold into the program. He had to become an IMA to participate in the program. He said success in the program depended on selling people into the organization. He was told Renaissance had 20-22,000 IMAs nationwide. LaPietra did not receive $5,000 in new business deductions. He became disillusioned with Renaissance because he did not receive the amount of support to build his business he had been promised by his sponsor and was offended by his sponsor's persistent effort to obtain his client list.

37. Brad Butler enrolled as an IMA in September, 2000. Butler was invited by an acquaintance to learn about a "business opportunity." He was told Renaissance had 50,000 or more IMAs in the company. Butler purchased the Founders Pack for $1200. Butler understood he needed to pay PTA dues to earn an over-ride. Butler questioned the legitimacy of some of the tax strategies proposed, decided to seek a refund and terminate his participation in Renaissance. Butler described his frustration associated with his effort to obtain a refund under the 15-day return policy.

38. In the process of his withdrawal, Renaissance sent Butler a letter dated October 6, 2000. Renaissance informed Butler:

> "We have received your request to cancel your participation in the monthly PTA program. Because you elected to withdraw from the Prepaid Tax Advantage (PTA) program, your IMA status has been converted to sales representative status in Renaissance only, and you will forfeit the current position of your Business Center in the downline. ...
>
> ...You must be active and qualified in the PTA program in order to earn up to $900 per day in Trinary Bonuses, as well as HUGE monthly residual income from the PTA program. Please be aware that, once your cancellation has been processed, you will forfeit your right to your business center's current position.
>
> **DANGER**WARNING**DANGER**WARNING...

State of Kansas vs. Michael Cooper d/b/a Renaissance TTB, Inc. - MD&Q Page 9 of 26

Case 3:06-cv-03273-SC Document 28-1 Filed 03/26/07 Page 9 of 26

\*\*\*\*

MOST OF ALL...maintain three active IMAs and your PTA fee is as good as FREE. Watch your DSB DOUBLE as your new people remain active in PTA! Since this means you can get a "free ride" ...why don't you take it?"

39. Renaissance has used numerous promotional materials in marketing its products, services and business opportunities. These materials include video-tapes, audio-tapes and printed materials.

40. The first video-tape entitled "$5,000/hr" was produced by AIM and bears a 1998 copyright. The TAS is described as the "business in a box." The video includes testimonials from several individuals about tax benefits associated with operating a home-based business and presents the TAS as the ideal business opportunity. The message is that the TAS will provide instant increases in an individual's take-home pay through withholding adjustments, provide thousands of dollars of business deductions and legally lower taxes by thousands of dollars. The TAS was presented as a simple, easy to follow system which would guarantee tax deductions and savings or the purchaser would be refunded his or her money. Tom Steelman, a member of the National Tax Team and represented as a tax expert, claimed at the end of the video that there is "no down side." Mr. Steelman said, "I don't see any problems whatsoever."

41. The second video-tape used by Renaissance was released in July, 1998. This video-tape entitled "It's Your Choice" includes claims that the TAS business plan provides prima facie evidence that the taxpayer has a real business and does not operate under hobby loss rules. In this video, Renaissance is misrepresented as a publicly traded company. It is claimed that Renaissance, since its founding in 1995, has quickly grown into a multi-million dollar publicly traded debt free corporation. The promotional video like its predecessor suggests that an individual can immediately increase take home pay--by up to $100 or more per week--by simply adjusting the individual's W-4 withholdings. In this video Renaissance claims that no one can dispute any of the information in [its TAS] system as the information has been approved in all 50 states for eight hours of continuing education credit for licensed professionals.

42. The representation that Renaissance is a publicly traded company is false.

43. The representation that Renaissance has been approved for continuing education credit is false. This representation is repeated in many promotional materials.

44. A revised version of "It's Your Choice" was released in August, 1998. Essentially, the same claims are made on this tape as were made in the July, 1998, version, but reference to Renaissance as a publicly traded company was deleted.

45. In September, 1999, a fourth video-tape entitled "Take a Bite Out of Your Taxes" was released. In this video, Renaissance claims that it was so convinced of the effectiveness of [the TRS system] that it would guarantee a minimum of $5,000 in new tax deductions during the first year of following the TRS business plan. Included in the tape are hypothetical examples of projected business expenses and the effect on taxable income. One hypothetical example shows that an individual earned $1,000 in his home-based business and was able to deduct business expenses of $34,560. On the tape it is suggested that 40 million people visit H & R Block each year for tax assistance but that H & R Block may not be qualified or motivated to maximize the taxpayer's tax savings--the inference being that

State of Kansas vs. Michael Cooper d/b/a Renaissance TTB Inc. FMD&O   Page 10 of 26

Case 3:06-cv-03273-SC   Document 28-1   Filed 03/26/07   Page 10 of 26

Renaissance had special qualities, qualifications and motivations to meet the taxpayer's needs.

46. The final video-tape styled "Take A Bite Out of Your Taxes, We Did" was used after August, 2000. In this video-tape, Renaissance deleted reference to the guarantee of $5,000 in deductions used in other promotional videos and materials. Furthermore, no suggestion was made about adjusting withholding to increase take-home pay. No claim was made that Renaissance was a publicly traded company. The tape still included untruthful representations that the Renaissance program was approved for eight hours of continuing professional education in all 50 states for licensed professionals.

47. Renaissance has also distributed audio-tapes which are included in the TAS/TRS. Four versions of the TAS/TRS were admitted into evidence, each containing between six and eight audio-tapes. In the first version of the TRS sold between March, 1999, and August, 2000, there are eight audio-tapes. The first five tapes promote the TRS and Prepaid Tax Advantage and provide information about home-based business deductions. The information is similar to the written presentation of subjects in the TRS workbook. Each version of the TAS/TRS provides some information about deductions and tax strategies and promotes the sale of Renaissance products and services.

48. Tape six includes several representations on side B. It is suggested that those who use the Renaissance TRS and Prepaid Tax Advantage have never been assessed one cent in an audit by the IRS. It is claimed that Prof. Dan Gleason, a former National Tax Team member, who now is at odds with Renaissance, has never lost a tax case. It is claimed that if Gleason does lose, Renaissance will pay penalty and interest. The claim is made that Renaissance will absolutely guarantee a minimum of $5,000 of new tax deductions. It is claimed that there is "no way you can lose." It is further claimed that "most families will see $20,000 or more deductions." In this tape, it is stated that if a customer drops out, the customer may lose between $2,000 and $20,000 in deductions in an audit. The tape extols the benefits of the TRS: the TRS provides the business which allows an individual to immediately cut taxes, increase income by adjusting the individual's W-4 and offers unlimited income potential.

49. On audio tape 8, Stanley Botkin presents the program -- "Ex IRS Agents Don't Lie." Botkin falsely states that the program is approved for continuing education credit in 50 states and for CPAs in 46 states. Botkin explains that one does not have to show a profit to take a deduction. He claims everything is simple. One merely needs to open a home-based business with the intention to make a profit to qualify for the deductions. Botkin claims that following the Tax Relief System will make one "audit proof."

50. On the cover of the clamshell binder of the most recent version of the Tax Relief System, Renaissance guarantees:

Guarantee
Save $1,000s
Cut $1,000s in Taxes

Earn $1,000s by Sharing With Others

We guarantee that by following our Business Plan and tax strategies, an Independent Marketing Associate will:

1) Realize a minimum of $5000 in additional tax deductible expenses based upon the Renaissance TTP home business.

2) Realize tremendous retail profit potential by selling the Tax Relief System.

3) Realize unlimited income potential with our exclusive "TRILOGY" compensation plan by sharing this exciting opportunity with others.

If you don't realize a minimum of $5000 in additional tax deductible expenses after your first year following this plan, we will refund the costs of your Tax Relief System PLUS any Platinum Tax Advantage costs incurred.

51. The guarantee published in earlier versions of the TAS/TRS used by Renaissance, and its predecessor AIM, provided:

### GUARANTEE
Save $1,000's
Cut $1,000's in Taxes

Earn $1,000's by Sharing with Others

We guarantee that by following our Business Plan and tax strategies, an IMA will: 1) Realize a minimum of $5000 in additional tax deductible expenses based upon the Renaissance home business. 2) Realize tremendous retail profit potential on thousands of wholesale products. 3) Realize unlimited income potential with our exclusive "TRILOGY" compensation plan by sharing this exciting opportunity with others.

**If you don't realize a minimum of $5000 in additional tax deductible expenses after our first year following this plan, we will refund the costs of your Tax Relief System PLUS any PTA costs incurred.**

52. Renaissance has also distributed printed promotional material. Two versions of "It's Your Money, Not TheIRS" were introduced into evidence. The first brochure, also identified as "The Renaissance Info Pack," used in 1999 through August, 2000, was admitted into evidence as Plaintiff's Exhibit 28. In August, 2000, some revisions of "It's Your Money, Not TheIRS" were made. This second brochure, also identified as "The Tax People.Net Info Pack" was introduced into evidence as Plaintiff's Exhibit 29 and was used by Renaissance after August, 2000.

53. The Info Pack used prior to August, 2000, begins with the teaser: "Your instant pay raise is waiting for you...." It is then claimed that the perfect tax strategy "can turn most of your family expenses into legitimate business expenses that are tax deductible." The TRS is introduced with hypothetical examples comparing income tax outcomes of one who has and one who does not have a home-based business. Hypothetical examples present home-based business income of $1000 and home-business deductions in excess of $30,000. After catching the reader's attention, Renaissance is represented to be one of the largest and fastest growing tax companies in the United States. Michael

Cooper is described as a "marketing genius." The credentials of other principals are also promoted.

54. The Info Pack then introduces Renaissance products, services and business opportunities. It is represented that "Renaissance guarantees, in writing, to provide $5,000 of new tax deductions, or your money back." The guarantee is "backed by the tax team." The following quote on page 15 of the Info Pack is attributed to Michael Cooper: "Like Cooper says, 'You are guaranteed to come out ahead. We guarantee you'll save $5,000 on your taxes this year, or we'll refund all of your money. You can't lose with this system'." Subsequent pages in the brochure claim the "Tax Dream Team," described as Renaissance's in-house team of hundreds of experienced tax professionals, is available to each and every IMA through the Prepaid Tax Advantage Program. For those IMAs who enroll in the Five-Star Audit Protection Program it is represented that the tax people commit to stand behind the IMA in an audit. It is stated on page 15 of the publication that "[b]ecause of their extensive knowledge of the tax code, the Tax Team has never lost an audit, and the majority of the time has had *more money refunded* at the end of an audit than the IRS meant to investigate!"

55. The Renaissance Info Pack also includes information on how to join Renaissance. The Independent Marketing and Associate Application Agreement, Form L-100 (7/14/99) used between March, 1999, and August, 2000, is included in the material and was used by IMAs to enroll other IMAs. Renaissance prices the Tax Relief System at "$300 down and $100 per month." A market funding program is offered at "$125 down toward $300 TRS and $125 per month for the PTA." The Founders Pack includes four Tax Relief Systems and free Career Pak and is priced at "$1200 down and $100 per month."

56. On page 9 of the Renaissance Info Pack, the Tax Relief System is described as a "complete turnkey business system" which includes a workbook, audio-tape set (ref. to IRS Code), video-tape, vehicle log, binder, seven-file system--simplicity in record keeping as well as Renaissance membership, personalized business plan, and medical reimbursement employment and independent contractor agreements. The Prepaid Tax Advantage is priced at $100 per month for "complete tax support." Support includes unlimited access to the tax team conference call, newsletter full of tax tips, etc., as well as unlimited toll-free one-on-one and e-mail consultations, unlimited pocket office tax consultations, unlimited audit protection (includes prior years), free 1040 basic state and federal returns, and free tax passports with ten hours of tax consultation.

57. On page 8 of the Info Pack, the compensation plan is described as being a plan with "integrity, balance, sizzle and strength." It is further written about the compensation plan:

How many times would you give someone $1 if they gave you back $4 or $5...? RENAISSANCE does this in 5 ways:

   1. Immediate $300 to $600 or more in tax-free cash, this month and every month, from Uncle Sam.

   2. Additional long-term reduction in taxes every year of $5,000, $10,000, or more annually.

   3. Renaissance's written guarantee that you will be able to increase your deductions by at least $5,000 in one year or they will refund all of your initial and monthly fees (the tax code is our ally, not our enemy.)

4. When you sign up three, your Tax Relief System is FREE.

5. Renaissance's pay plan could return you thousands for every dollar you invest in the product each month.

58. Some changes were made in August, 2000, to the brochure "It's Your Money, Not TheIRS." In this version, one section explains the Affiliated Taxpayer Network Program. Some material was deleted such as the description of the compensation plan quoted in Finding of Fact 57, above. Mr. Cooper's statement about "saving" $5,000 on taxes was deleted from this publication. Modifications were made to the Independent Marketing Associate Application Agreement. Additional forms were also published, including the Retail Order Form and the Service Upgrade and Product Order Form as well as others. In the August, 2000, version of the Information Pack, changes were made in the description of the monthly services. The services formerly called Prepaid Tax Advantage were renamed The Platinum Tax Advantage. In the earlier version the Prepaid Tax Advantage was made available automatically to customers who purchased the TRS and provided Renaissance with a payment method for $100 per month. In August, 2000, services were broken down into separate categories for individual tax advice, individual audit representation, business tax advice and business audit representation and priced at $10, $20, $30 and $40 respectively, or $100 for all Platinum Tax Advantage services. As stated above, however, audio-tape six of the August, 2000, TRS still refers to the services as Prepaid Tax Advantage offered at the price of $100 per month with associated residual income potential.

59. The state alleges that defendants have committed numerous deceptive acts and practices in violation of the KCPA. The state asserts that, in oral and written representations, Renaissance has knowingly misrepresented material facts, willfully failed to state material facts and willfully concealed material facts about the business opportunity, product and services which it offers to consumers. According to the state, Renaissance has misrepresented the size of its ATPN and the extent of acceptance by tax professionals of the TRS; has misrepresented or exaggerated its success and results in audits by the Internal Revenue Service; has made false assurances of legality about the tax deductions and strategies of the TRS; has used exaggeration and falsehood in guaranteeing consumers tax deductions and savings; and has misrepresented or omitted material facts about profit and earning opportunities available to consumers through participation in its programs.

60. Renaissance argues that only versions of its promotional materials used after August, 2000, should be considered for purposes of determining whether a temporary injunction should issue. Renaissance suggests earlier materials are not in use or have been abandoned. On this point, the Court finds Renaissance has failed to prove that August, 2000, changes in its promotional materials, policies, procedures and practices have actually been made and implemented at the corporate level, and in addition, Renaissance has failed to establish that the changes have been actually implemented in the field by IMAs and that Renaissance has enforced the new rules. Moreover, the alleged deceptive features of the promotional materials and marketing scheme must be viewed in context. IMAs have joined Renaissance under all programs and the fundamental features of all programs are substantially the same. Consumers have been lured by misleading guarantees of instant benefit, hooked by false assurances of professional acceptance, landed by deceptive promises of unlimited income, and retained by threats of tax catastrophe upon withdrawal. Accordingly, the Court will consider all versions of the TAS/TRS and promotional materials as well as Renaissance policies, procedures and practices from October, 1997, through the present. Defendants' objection to admission of evidence

State of Kansas vs. Michael Cooper d/b/a Renaissance TPB, Inc. - MD&O    Page 14 of 26

Case 3:06-cv-03273-SC    Document 28-1    Filed 03/26/07    Page 14 of 26

relating to Renaissance operations prior to August, 2000, is overruled.

61. Based upon the above findings of fact and consideration of all evidence in the record, the Court finds the following allegations to be true by a preponderance of the evidence:

a. Renaissance has knowingly and willfully misrepresented the size of its Affiliated Tax Professional Network and the extent of approval afforded defendants' services by the ATPN. The ATPN was organized in August, 1999. Mr. Cota, the defendants' Director of Taxation, admitted that the network only had 540 members. Renaissance has represented thousands of tax firms have affiliated with Renaissance through membership in the ATPN. These representations have been made in printed promotional material and published on the Renaissance website. These false representations have been made from and after August, 1999, through February, 2001. The misrepresentations are material. Renaissance has used ATPN membership and endorsements to validate its products and services. These misrepresentations have been knowingly and willfully made in violation of K.S.A. 50-626(b)(1)(A) and (B); K.S.A. 50-626(b)(2) and K.S.A. 50-626(b)(3).

b. Renaissance has falsely misrepresented its audit protection. Renaissance has knowingly and willfully misrepresented the success and results of its audit program. Both prior to and after the program changes in August, 2000, Renaissance has falsely claimed that the Tax Dream Team was an "in-house team of hundreds of experienced tax professionals." Renaissance claims that it has never lost an audit and that the majority of time has had money refunded. This misrepresentation of audit success has been made in oral and written presentations. As late as August, 2000, Renaissance continued to make the representation regarding audit results and its success. The only evidence on audit success was offered during Mr. Cota's testimony. He admitted that 41 of the 100 audits handled by the Tax Team or others at the referral of the Tax Team ended in no additional assessment. The other audits ended in an adjustment. Many audits were not handled by the Tax Team. No evidence was presented to the Court in regard to reasons others handled audits. No evidence was presented as to whether these audits were managed under Renaissance's 2% National Tax Audit Program available under the TAS or the current program. Representations about audit success have been exaggerated. These misrepresentations are material. The misrepresentations have been made to influence consumer choice in whether to join Renaissance. Renaissance has engaged in a deceptive act or practice by using exaggeration or falsehood and ambiguity as to material facts relating to the success of its audit program, contrary to K.S.A 50-626(b)(1)(A) and (D); K.S.A. 50-626(b)(2) and K.S.A. 50-626(b)(3).

c. Renaissance has made false assurances of legality in its promotional materials. Renaissance has falsely claimed approval for its program for a continuing education credit and has exaggerated the extent of acceptance of its products by tax professionals. Renaissance has used the claim of approval to support its marketing of products and services as being legal. It is further noted that in some promotional material Renaissance even suggests that the IRS has approved its program. These misrepresentations are material. These false claims have been made in print, video and audio promotional materials and violate K.S.A. 50-626(b)(1)(A) and (B); K.S.A. 50-626(b)(2); and K.S.A. 50-626(b)(3).

d. Renaissance has engaged in deceptive acts and practices by making false and

exaggerated income potential claims and by willfully concealing and suppressing material facts regarding the potential income for all IMAs. In its print, video and audio presentations, as well as in personal presentations to prospective consumers, Renaissance has represented unlimited or infinite income potential. In its promotional materials, Renaissance has used hypotheticals to project income potential for consumers but has suppressed information that for most participants achieving the represented income potential is not mathematically probable. Renaissance has not disclosed that only a small number of participants may achieve the claimed results. These misrepresentations and omissions are material. These deceptive acts and practices are contrary to K.S.A. 50-626 (b)(2) and (3).

   e. Renaissance has engaged in deceptive acts and practices by making false and exaggerated guarantees of deductions and tax savings available to IMAs. In its print, video and audio presentations, as well as in personal presentations to prospective consumers, Renaissance has guaranteed $5,000 in new tax deductions and in some instances, has represented that the purchaser will receive $5,000 in tax savings. The credible evidence establishes that some purchasers may obtain the level of guaranteed deductions and others may not. With respect to each taxpayer the allowable deductions depends on a number of variables. The amount of deductions which a person may claim is dependent on each person's unique circumstances. Renaissance has suppressed the fact that some purchasers of its program may not be able to achieve the represented deductions and savings. Therefore, the claim that Renaissance can guarantee the minimum amount of legitimate deductions is false. The only IMA who testified as to the amount of deductions was Ray LaPietra. His circumstances did not result in $5,000 of new deductions as guaranteed by Renaissance. Renaissance has used exaggeration and falsehood in guaranteeing consumers tax deductions and savings. The guarantees have been communicated through a variety of media from October, 1997, through the present. The misrepresentations and omissions are material. These deceptive acts and practices are contrary to K.S.A. 50-626(b)(2) and (3).

   62. In this action, the state further accuses Renaissance of operating an illegal pyramid promotional scheme. Renaissance replies that it has developed a legitimate network marketing program utilizing Independent Marketing Associates (IMAs) to market and sell its products and services. Renaissance states that its products and services are in great demand as a result of many people desiring to operate home-based businesses. Renaissance points out that other entities market tax advice products similar to the TRS and monthly tax advice and audit representation services. However, Renaissance represents that it is the first company to market tax advice products through a multilevel network marketing organization. In its publications, Renaissance has represented varying numbers of IMAs. Renaissance states 55,000 IMAs have purchased products and services. Renaissance states that 5,000 IMAs are presently actively involved in the sale of monthly tax services and the TRS.

   63. The parties and experts each debated application of the *Amway* standards to Renaissance. Prior to August, 2000, Renaissance did not comply with *Amway* criteria. Before August, 2000, primary emphasis by Renaissance was directed at recruitment of people into the organization rather than retail sales. Although *Amway* serves as a useful analytical aid, the fundamental test is whether the network marketing scheme requires participants to pay Renaissance for the right to sell its product and gain position in the corporation structure and whether in return for helping Renaissance enter into other consumer transactions participants will receive (or are promised) a future benefit unrelated to the sale of the product to the ultimate retail consumer.

State of Kansas vs. Michael Cooper d/b/a Renaissance TTP, Inc. - MD&O

Case 3:06-cv-03273-SC   Document 28-1   Filed 03/26/07   Page 16 of 26

64. Based on the credible evidence, the Court finds Renaissance primarily sells positions in the company. Retail sales have not been emphasized. The sale of the Tax Advantage System and Prepaid Tax Advantage to the retail public has been incidental to the sale of product and services to IMAs who are required to purchase the products and services in order to maintain position in the pyramid compensation structure.

65. The parties spent considerable time debating the utility of the TRS. The product has been offered in four different versions between October, 1997, and August, 2000. While several changes have been made in presentation, the changes have been largely cosmetic. The fundamental features of the program have remained consistent. A purchaser is promised an instant pay raise, substantial guaranteed deductions, unlimited income for recruiting additional IMAs and, if audited by the IRS for applying Renaissance strategies, protection by the Dream Team which has never lost a single penny in an audit and frequently obtains an additional refund for the taxpayer.

66. The information regarding home-based business deductions is based upon Renaissance's interpretation of the Internal Revenue Code. Tax accountants who testified as expert witnesses debated the utility of providing this information to the public. Mr. Ronald Ramberg, plaintiff's expert, opined the TRS contained errors, incomplete information and had questionable value as a product. Mr. Ramberg opined that Renaissance was in the business of selling tax deductions and promoting sham tax transactions.

67. In contrast, Mr. Warren Heatly, defendants' expert, opined that the TRS provided basic information on home business deductions. Mr. Heatly suggested that a consumer could receive some benefit from the information. Mr. Heatly described the TRS as a primer on home business tax strategies. In Heatly's opinion, while the TRS contains some incorrect information it would generally be useful as a source of information for someone interested in learning about home-based business deductions. Mr. Heatly disagreed with Mr. Ramberg as to whether promoting the information constituted the selling of tax deductions or a tax sham.

68. The Prepaid Tax Advantage was originally promoted under the TAS. Benefits were quite limited under the TAS offering the consumer up to $250 in reimbursement in an IRS audit related to the IMA's business. The TRS expanded the tax service and audit protection. The precise benefits or limitations of the present program are not entirely clear. As of August, 2000, Renaissance stated it began offering four separate services at different prices under the Platinum Tax Advantage Program, but the audio-tapes suggest otherwise.

69. The Court has no difficulty finding that the TRS is a product containing some useful, albeit simplistic and in some respects inaccurate, information for ultimate consumers regarding home-based business deductions. The Court further has no difficulty finding that monthly tax services and audit protection may benefit ultimate consumers to the extent performance is actually delivered as promised. As Renaissance argues, these same products and services are offered by competitors. While no evidence was produced on this point, the Court has no difficulty accepting this proposition.

70. The finding that the product or service has some beneficial qualities does not end the inquiry. If these products and services were simply sold to retail consumers there would be no issue before the Court. What must be analyzed is whether Renaissance has constructed an illegal pyramid referral scheme for marketing its business opportunity. The multilevel marketing strategy used by Renaissance is, as Renaissance claims, what distinguishes it from the manner in which competitors' products and

services are marketed.

71. From the beginning, Renaissance has sought to enlist consumers as independent marketing associates. Consumers have been induced to purchase a position in the business through the use of exaggerated and false projections of unlimited and infinite income potential. The TRS itself has been promoted as a product in which one cannot lose. It is represented that one can receive an instant pay raise which is a misleading concept in itself. The raise is simply an adjustment of withholding by the taxpayer which results in more monthly net income but may expose the taxpayer to a larger tax liability at the end of the year if the anticipated business deductions are not achieved. An adjustment of withholding is not a pay raise. Renaissance then persuades potential sales agents that purchasing the "Business In a Box" and promoting it to others is prima facie evidence of conducting a legitimate business for which expenses will be deductible under the tax code. Through the use of hypothetical examples, the defendants suggest that for limited sales efforts substantial deductions are guaranteed. These hypotheticals are misleading. Renaissance suggests that by having its business plan which was offered free under certain versions of the TAS/TRS and by intending to be in business that one is eligible for deductions. Renaissance does not emphasize the need to be actively involved in the business of selling the product and that only necessary and reasonable expenses may be deducted. Once the consumer has been convinced to purchase and market the TRS and tax service, the consumer was required to participate in the Prepaid Tax Advantage program in order to qualify for commissions.

72. Under the Prepaid Tax Advantage program, the consumer has been required to pay Renaissance $100 per month in return for the right to recruit others into the program and earn unlimited future commissions. In versions of the IMA application used between October, 1997, and August, 2000, Renaissance had either a pre-printed check mark in the box for the Prepaid Tax Advantage program or tied the purchase of the TRS to the Prepaid Tax Advantage. On its IMA application used between July, 1999, and at least until the purported changes in the program in August, 2000, an IMA purchased the TRS by paying "$300 down and $100 per month." The Prepaid Tax Advantage payment was required whether the consumer wanted any tax advice or would benefit from participating in weekly telephone calls, receiving newsletters or audit protection.

73. The Attorney General correctly describes the Prepaid Tax Advantage program as the price to be paid for eligibility to participate in the infinite and unlimited sales commission income opportunities.

74. Under the Tax Advantage System the pay-to-play feature had a very negligible benefit to the consumer. For $1200 per year, the consumer could participate in telephone calls, receive newsletters and audit protection. At most, if an IMA was audited by the IRS with respect to the IMA's home-based business Renaissance would pay up to $250 to the IMA's local accountant and offer consultation with the Dream Team. The benefit was apparently expanded under later versions of the program but the precise value which attaches to the benefit is unclear. Renaissance produced no evidence regarding the benefit paid for the audit services.

75. Even APTN members were required to participate in the Prepaid Tax Advantage program to become and to remain eligible for commissions. These individuals are some of the same individuals who are promoted as the Renaissance tax experts. Notwithstanding, ATPN tax experts were required to buy the very tax services they were offering as the price of admission to the commission scheme.

76. The expansion and growth of Renaissance has been built upon a scheme for the sales of positions with the company which sales authorize individuals to sell not only tax information and services but also additional positions with the company.

77. When another person purchases into the company the sponsor receives a percentage of all amounts the new recruit pays into Renaissance for his or her position and for products and services.

78. Recruits are solicited by being told of a unique business opportunity.

79. Mathematical examples are used to recruit others into the network and are used to illustrate how profits may multiply geometrically as the organizational structure grows and pyramids.

80. Recruits are told they can reap huge commissions by recruiting others into the company.

81. Recruits are encouraged to bring others into the organization as the primary method to reap tremendous profits. Prior to August, 2000, retail sales were not emphasized as the primary way to enjoy income opportunity and to the extent there were any retail sales prior to August, 2000, such sales were incidental to achieving profits through recruiting others into the marketing scheme.

82. Prior to August, 2000, Renaissance admits retail sales were not emphasized, encouraged or tracked by the company for purposes of qualifying for commissions. Renaissance had no retail sales requirements for participation in the company before changes were made to the compensation policies in August, 2000.

83. Recruits were induced to purchase the TRS and Prepaid Tax Advantage upon the representation that he or she could not only regain the purchase price, but also earn unlimited profits by selling the same program to others.

84. Mandatory participation in the Prepaid Tax Advantage was the purchase price for the right to sell the same right to sell to others and maintain one's position in the company. Brad Butler who was recruited after August, 2000, said that "[t]he only thing that was presented to me...was...I'd have to pay PTA dues and that we get overrides on other people's dues..."

85. At its core, the Renaissance marketing plan is a clever scheme to extract money from consumers through the use of misrepresented facts, exaggerated claims and projections, undisclosed material facts and false promotions.

86. The scheme induces consumers to purchase the TRS and services upon the representation that huge commissions will be received by consumers contingent on recruiting others into the marketing scheme.

87. Renaissance claims that it reconstituted its marketing policies, practices and procedures in August, 2000, to bring its network marketing program within the guidelines of the *Amway* criteria. This claim is not established by the evidence. The modifications were cosmetic changes to the underlying pyramiding program. No credible evidence establishes that the retail sales rules and other *Amway* criteria were actually implemented and enforced. On the contrary, the credible evidence establishes that business continued as usual after the purported modifications.

88. The key to an anti-pyramiding rule is that commissions must be tied to actual retail sales to ultimate consumers. Here, Renaissance, between October, 1997, and August, 2000, never emphasized any requirement for retail sales to ultimate consumers.

89. The evidence establishes that Renaissance does not operate a legal multilevel marketing program related to sales of products or services to the ultimate retail consumer but instead operates an illegal pyramid referral scheme that is based primarily on recruiting others into the pyramid scheme. By the structure of the scheme alone, new recruits cannot achieve the income potential represented on account of mathematical saturation of the market.

90. Legitimate multilevel marketing programs exist by making money off product sales to ultimate end-users, not new recruits.

91. At all material times, Renaissance has emphasized making money off recruitment of sales associates rather than retail sales to the consuming public.

92. The Court finds that since October, 1997, through the present, defendants have operated an illegal pyramid promotional scheme. Until August, 2000, there is no evidence offered to establish that Renaissance emphasized retail sales to ultimate consumers. On the contrary, the marketing plan solely depended upon recruiting others to the business. Renaissance promised benefits to prospects as an inducement for entering into a consumer transaction. In return for helping Renaissance enter into other consumer transactions, defendants promised substantial future compensation with attention on the success of recruiting others into the marketing plan. Defendants required participants to continue paying the Prepaid Tax Advantage monthly fee of $100 to participate in the compensation plan. An extraordinary income opportunity is present for a few individuals who joined the program early but those who joined later were not informed about the nature of the compensation plan and the lack of any reasonable probability of achieving the promised profit. The premise on which individuals were recruited was based on the concept communicated in the Renaissance promotional material of telling a friend who tells a friend who tells a friend for generations to come.

93. Finally, the effort by Renaissance to bring its marketing program within the *Amway* criteria such as retail sales requirements and buy back policies were implemented late in the scheme, were not uniformly implemented and were not enforced. There is no credible evidence respecting actual implementation and enforcement of Renaissance's claimed new rules. There is evidence that Renaissance conducted business as usual as illustrated by its maintenance of the rule requiring mandatory payment of the Prepaid Tax Advantage fee.

94. The Court finds that Renaissance has operated an illegal pyramid promotional scheme and has committed deceptive acts and practices in violation of K.S.A. 50-626(b)(1)(E).

95. Given the fundamentally deceptive nature of the Renaissance marketing scheme, broad relief is warranted.

96. A temporary injunction enjoining the corporate defendants from conducting sales and marketing of the TRS and monthly tax services is warranted under these circumstances.

97. The Court further finds that individual defendant Michael C. Cooper should be enjoined from directly or indirectly participating in the business of the corporate defendants and should be personally enjoined from participating directly or indirectly in unlawful and deceptive marketing schemes.

98. Mr. Cooper participated directly in the wrongful acts and practices and had the authority to control the corporate defendants.

99. Mr. Cooper had specific knowledge of the acts and practices regarding the marketing of the corporate defendants' product and services.

100. The record is replete with evidence sufficient to hold Michael C. Cooper individually liable for injunctive relief and consumer redress. Mr. Cooper was the moving force behind the wrongful acts and practices of the corporations. Mr. Cooper developed and executed the idea for the Tax Relief System, Prepaid Tax Advantage, and compensation plan. Mr. Cooper authorized and approved marketing methods. Mr. Cooper has participated in conference calls and recruiting activities all of which clearly indicate Mr. Cooper participated directly in the deceptive acts and practices of the corporations.

101. Furthermore, Mr. Cooper previously entered into a Consent Order related to a prior multilevel marketing activity. In that Consent Order he agreed not to participate in other ventures which violated or would violate the Kansas Consumer Protection Act. After entering the Consent Order, Mr. Cooper began his current venture which the Court finds is deceptive to its core.

## CONCLUSIONS OF LAW

1. The Attorney General has authority to bring this action under the Kansas Consumer Protection Act, K.S.A. 50-623 *et seq.* K.S.A. 50-632(a)(2) provides the Attorney General may bring an action "to enjoin, or obtain a restraining order against a supplier who has violated, is violating, or is otherwise likely to violate" the Kansas Consumer Protection Act.

2. The Court has subject matter jurisdiction over this action under K.S.A. 50-638(a).

3. This Court has proper venue for this action under K.S.A. 50-638(b).

4. Defendants are suppliers as defined by K.S.A. 50-624(i).

5. Defendants, at all relevant times, have been engaged in consumer transactions as defined by K.S.A. 50-624(c).

6. The state must prove its claims by a preponderance of the evidence.

7. The Kansas Consumer Protection Act (KCPA) should be liberally construed by courts to promote the public policy of protecting consumers from suppliers who commit deceptive and unconscionable practices. K.S.A. 50-623(b); *Finstad v. Washburn University of Topeka*, 252 Kan. 465, 468, 845 P.2d 685 (1993); *William v. Ewen*, 230 Kan. 262, 267, 634 P.2d 1061 (1981).

8. The KCPA authorizes the Court to make such orders as may be necessary to prevent a supplier from committing deceptive acts and practices declared to be a violation of the Act. The court may make such orders or grant other appropriate relief to prevent violations of the KCPA including enjoining any supplier from engaging in business in Kansas. K.S.A. 50-632(c)(1), (6) and (8).

9. Ordinarily, in order to obtain temporary injunctive relief a movant is required to show: (1) that the movant has a substantial likelihood of eventually prevailing on the merits; (2) that the movant has no adequate legal remedy and will suffer irreparable injury unless an injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause to the

State of Kansas vs. Michael Cooper d/b/a Renaissance THB, Inc. (MD&S) Page 21 of 26

Case 3:06-cv-03273-SC    Document 28-1    Filed 03/26/07    Page 21 of 26

opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest. *Mid America Pipeline Co. v. Wietharn*, 246 Kan. 238, 787 P.2d 716 (1990); *Wichita Wire, Inc. v. Lennox*, 11 Kan. App. 2d 459, 726 P.2d 287 (1986).

10. When an injunction is authorized by statute, relief is not precluded because other remedies at law may be available. In addition, the movant may not be required to demonstrate that the threatened injury outweighs whatever damage may be caused to the opposing party.

11. The Court has found that defendants have committed deceptive acts and practices related to misrepresentations and omissions in promoting and marketing products and services. The state has carried its burden of proof by establishing violations by a preponderance of the evidence.

12. The false representations and omissions by defendants are material. A matter is material if it is one to which a reasonable person would attach importance in determining his or her choice of action in the transaction in question. *Griffith v. Byers Construction Co.*, 212 Kan. 65, 73, 510 P.2d 198 (1973). The statements were intended by defendants to induce consumers to purchase products and services and to join the pyramid referral sales scheme. It is reasonable for a consumer to rely on expressly made claims. A reasonable person would attach importance to the statements in choosing whether to join Renaissance.

13. Defendants argue that their statements constitute commercial speech protected by the First Amendment. *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 473, 109 S. Ct. 3028, 106 L. Ed 2d 388 (1989); *Blue v. McBride*, 252 Kan. 894, 921, 850 P.2d 852 (1993). Defendants argue that the state is attempting to limit public access to its educational materials regarding home-based business deductions.

14. On the contrary, the state seeks to prohibit defendants from making false and misleading statements and concealing or omitting material information about the products, services and business opportunities they sell. The state may regulate speech: (1) when the regulation serves a substantial government interest; (2) when the regulation directly advances the asserted interest; and (3) when the regulation is narrowly tailored to serve substantial governmental interest. *Greater New Orleans Broadcasting Association v. United States*, 527 U.S. 173, 183, 119 S. Ct. 1923, 144 L. Ed. 2d 161 (1999).

15. The regulation of deceptive acts and practices in consumer transactions serves a substantial government interest. Defendants have marketed products, services and business opportunities with the use of falsehood, exaggeration, ambiguity and through omission of material facts. The state seeks to enforce substantial and important public policy by protecting consumers from deceptive acts and practices.

16. The state has established its burden by identifying the substantial governmental interests and by demonstrating that the prohibition it seeks to place upon defendants' commercial speech is justified and is tailored to protect the public from deceptive acts and practices.

17. Defendants have engaged in deceptive acts and practices in connection with a consumer transaction by making representations knowingly or with reason to know that defendants' products and services have sponsorships or approvals that defendants' products and services do not have, in violation of K.S.A. 50-626(b)(1)(A) of the Kansas Consumer Protection Act.

State of Kansas vs. Michael Conner d/b/a Renaissance TBB, Inc. - MD&O    Page 22 of 26

Case 3:06-cv-03273-SC   Document 26-1   Filed 03/26/07   Page 22 of 26

18. Defendants have engaged in deceptive acts or practices in connection with a consumer transaction by making representations knowingly or with reason to know that defendants have sponsorships, approvals, status affiliations or connections that defendants do not have in violation of K.S.A. 50-626(b)(1)(B) of the Kansas Consumer Protection Act.

19. Defendants have engaged in deceptive acts or practices in connection with a consumer transaction by making representations knowingly or with reason to know that defendants' services have a particular standard or quality when defendants' services are of another which differs materially from defendants' representations in violation of K.S.A. 50-626(b)(1)(D) of the Kansas Consumer Protection Act.

20. Defendants have engaged in deceptive acts or practices in connection with consumer transactions by willful use of exaggeration, falsehood, innuendo, and ambiguity as to material facts, in violation of K.S.A. 50-626(b)(2) of the Kansas Consumer Protection Act.

21. Defendants have engaged in deceptive acts or practices in connection with consumer transactions by willfully failing, in oral and written representations, to state material facts, and willfully concealed, suppressed or omitted material facts in oral and written representations in violation of K.S.A. 50-626(b)(3) of the Kansas Consumer Protection Act.

22. Based upon the findings of fact set out above, the Court further concludes defendants have committed deceptive acts and practices by operating and promoting an illegal pyramid referral sales scheme in violation of K.S.A. 50-626(b)(1)(E).

23. The KCPA includes as a deceptive act or practice representations, made knowingly or with reason to know that, "the consumer will receive a rebate, discount or other benefit as an inducement for entering into a consumer transaction in return for giving a supplier the names of prospective consumers or otherwise helping the supplier to enter into other consumer transactions, if receipt of benefit is contingent on an event occurring after the consumer enters the transaction." K.S.A. 50-626 (b)(1)(E).

24. The only definition of pyramid promotional scheme in our statutes is contained in K.S.A. 21-3762(a). That statute provides that "'pyramid promotional scheme' means any plan or operation by which a participant gives consideration for the opportunity to receive compensation which is derived primarily from any person's introduction of other persons into participation in the plan or operation rather than from the sale of goods, services or intangible property by the participant or other persons introduced into the plan or operation."

25. An illegal pyramid promotional scheme exists where participants earn compensation primarily through the recruitment of other participants rather than through the sale of products and services to ultimate retail consumers. *State ex rel. Sanborn v. Koscot Interplanetary, Inc.*, 212 Kan. 668, 675-76, 512 P.2d 416 (1973).

26. A pyramid scheme rewards participants for inducing other people to join the program, while a legitimate multi-marketing program survives by making money off product or service sales to ultimate users. *U. S. v. Gold Unlimited, Inc.*, 177 F.3d 472 (6th Cir. 1999). The element of an illegal pyramid scheme in which revenue is derived from recruitment rather than sales implies that market saturation must occur so that at some point, persons on the lower tier of the structure will not be able to find new

recruits and the pyramid will collapse.

27. In the most extreme form of a pyramid scheme, there is no product or service; instead, people are motivated to join by promises of a certain portion of the payments made by those who join later and are placed in one's "downline." If enough additional people join the scheme, a given number could recoup not only the initial payment but could receive additional returns. But, by the nature of the scheme, those at the bottom of the structure at any given time will have lost money, and the number of consumers at the bottom who have lost money will grow exponentially as more people are recruited to join. Furthermore, the required number of new members cannot, in fact, be recruited on a perpetual basis, causing the scheme to collapse of its own weight if it does not first falter when a significant number of members are unable to find enough people as gullible as themselves to recruit.

28. By contrast, a legitimate multilevel marketing system includes a system of distributing products or services in which each participant earns income from sales of a product to his or her downline and also from sales to the public. In a multilevel marketing program, revenues from sales of the goods and services to retail consumers is sufficient to cover the production costs or costs of the goods sold, the various marketing expenses, and the promised rewards for recruiting new participants. If the revenue from such retail sales is sufficient, there is no structural certainty of collapse.

29. Some organizational structures pose less risk of harm to investors and the public and authorities permit these programs to operate even though they contain some elements of a pyramid scheme. In *In the Matter of Amway Corporation, Inc.*, 93 F.T.C. 618 (1979), the Federal Trade Commission charged Amway with operating an illegal pyramid scheme. According to the FTC, the Amway marketing scheme involved an endless chain of recruiting activities based on misrepresenting the profitability and potential of Amway distributorships.

30. According to the FTC, pyramid schemes are characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for referring other participants into the program rewards which are unrelated to the sale of the product to the ultimate consumer. *Amway* 93 FTC at 715.

31. The FTC found that Amway misrepresented earning potentials, but concluded that Amway did not operate an illegal pyramid scheme. In evaluating the Amway network marketing system, the FTC identified several criteria for evaluating the legitimacy of network marketing programs. These criteria seek to separate marketing structures, which contain elements of a pyramid, but pose less risk of harm to investors and the public, from illegal pyramid schemes which pose substantial risk of harm to consumers. Even though decided more than twenty years ago, the *Amway* standards still serve as a useful measure for evaluating whether a network marketing system is legitimate or an illegal pyramid.

32. Dr. Charles W. King, a professor holding a doctorate degree in business administration, testified as defendants' expert on network marketing. Dr. King was retained to provide an opinion as to whether or not the sale of the TRS and tax service was a legitimate home-based business. Dr. King reviewed information provided by defendants. The information provided consisted of policies, procedures and practices which defendants state were implemented in August, 2000. No opinion was offered by Dr. King about the legitimacy of marketing policies or practices before August, 2000.

33. Dr. King testified generally that Renaissance's policies complied with *Amway* standards as of his review in October, 2000. Dr. King briefly addressed each *Amway* criteria and opined Renaissance was a legitimate network marketing company.

State of Kansas vs. Michael Cooper d/b/a Renaissance TTP, Inc. - MD&O   Page 24 of 26

Case 3:06-cv-03273-SC   Document 28-1   Filed 03/26/07   Page 24 of 26

34. The Court rejects Dr. King's opinion. Dr. King admitted that he was not familiar with the company's actual practices and whether the criteria were actually implemented and enforced. Dr. King further admitted on cross-examination that he was unaware that participants were required to pay for Prepaid Tax Advantage services to maintain position in the commission structure and that Renaissance's handling of Mr. Butler's refund request was inconsistent with *Amway* standards.

35. Based on the credible evidence, the Court concludes Renaissance did not comply with *Amway* standards. The Court further concludes that at all material times defendants have operated an illegal pyramid promotional sales scheme contrary to K.S.A. 50-623(b)(1)(E).

36. Defendants have engaged in deceptive acts or practices in connection with consumer transactions by making representations knowingly or with reason to know that the consumer will receive a rebate, discount or other benefit as an inducement for entering into a consumer transaction in return for giving the supplier the names of prospective consumers or otherwise helping the supplier to enter into other consumer transactions, where receipt of the benefit is contingent on an event occurring after the consumer enters into the transaction, in violation of K.S.A. 50-626(b)(1)(E) of the Kansas Consumer Protection Act.

37. Based upon the findings and conclusions set forth above, the Court concludes that plaintiff is entitled to injunctive relief against defendants. Accordingly, a Temporary Injunction shall issue. The state has met its burden of showing a reasonable probability that the state will ultimately be entitled to redress on the merits. The state has further demonstrated that the public interest would be advanced by issuance of the Temporary Injunction.

38. Defendants have argued that the state cannot establish a reasonable probability of future injury because defendants voluntarily terminated any and all conduct that allegedly violated the Kansas Consumer Protection Act before the state filed this lawsuit. The Court has found otherwise. The illegal conduct engaged in by the defendants has continued from October, 1997, through the present. Furthermore, the Court has found that the purported voluntary changes implemented by defendants to implement *Amway* criteria have not been demonstrated.

## ORDER OF TEMPORARY INJUNCTION

IT IS ORDERED that defendants, Michael C. Cooper, Renaissance TTP, Inc., Advantage International Marketing, Inc., and other unnamed John and Jane Doe defendants, as well as all successors, assigns, officers, agents, representatives, employees and heirs, including any individual or entity with whom or which defendants have affiliated to provide or market products and services, shall cease and desist and shall be enjoined from either directly or indirectly:

    a. conducting any and all activities related to the advertising, marketing, promoting, offering for sale or selling of the Tax Relief System or any predecessor versions of the Tax Relief System or Tax Advantage System, and related products, services or components including but not limited to books, video and audio-tapes, forms, newsletters and business plans;

    b. conducting any and all activities related to the advertising, marketing, promoting,

State of Kansas vs. Michael Cooper d/b/a Renaissance TTP, Inc. MD692

Case 3:06-cv-03273-SC   Document 28-1   Filed 03/26/07   Page 25 of 26   Page 25 of 26

offering for sale or selling of the Prepaid Tax Advantage and/or Platinum Tax Advantage services, including but not limited to providing tax information and/or tax advice and audit representation through defendants' National Tax Team, Affiliated Tax Professional Network, through periodic telephone conferences, e-mails, newsletters, and other means except that defendants and affiliates shall continue to provide professional audit services and representation for any customer of defendants with respect to any audit notice provided to defendants prior to the entry of this Order of Temporary Injunction by any Independent Marketing Associate or any other person who has purchased Prepaid Tax Advantage or Platinum Tax Advantage;

c. conducting any and all activities related to enrolling new members in or processing orders for the Tax Relief System, or tax services, its components and all other products and services sold by them;

d. conducting any and all activities related to accepting payment for their Tax Relief System, its components, and all other products and services claimed to be sold by them;

e. conducting any and all activities related to accepting payment for Prepaid Tax Advantage and/or Platinum Tax Advantage services;

f. conducting any and all activities related to the operation of any multilevel or network marketing program, referral sales program, and/or business opportunity involving multilevel or network marketing; and/or

g. conducting any and all activities related to the paying of commissions, bonuses, or compensation of any kind to anyone without Court approval.

IT IS FURTHER ORDERED that all bank accounts owned or maintained by defendants, except for any account used by Michael C. Cooper solely for personal reasons, shall be immediately frozen and shall remain intact, and no funds shall be paid from such accounts or transferred from such accounts without Court approval.

IT IS FURTHER ORDERED that defendants shall not sell, transfer, assign, convey, exchange or dispose of any property or assets in which they have any interest without Court approval.

IT IS FURTHER ORDERED that the authority of Renaissance TTP, Inc., to conduct business in the state of Kansas should be and is hereby revoked.

IT IS FURTHER ORDERED that a receiver shall be appointed under authority of K.S.A. 50-637 as a receiver for Renaissance TTP, Inc., and that such receiver shall receive and take into the receiver's possession all the property and chattels, rights and credits, moneys and effects, lands and tenements, books, records, documents, papers, choses in action, bills, notes and property of every description, including property with which such property has been commingled, if it cannot be identified in kind because of such commingling, and to hold and preserve such property under the direction of the Court.

IT IS SO ORDERED.

May 15, 2001.

_____

RICHARD D. ANDERSON
DISTRICT JUDGE


### CERTIFICATE OF MAILING

I hereby certify that a copy of the above and foregoing Memorandum Decision and Order was served this day of May, 2001, by mailing, postage prepaid, and by fascimile, on the following:

Marilyn B. Keller; James R. Hobbs, Attorneys at Law, 1300 Mercantile Tower, 1101 Walnut, Kansas City, MO 64106

Jerold E. Berger, Attorney at Law, 525 S. Topeka Blvd., Topeka, KS 66603

Rex G. Beasley; Assistant Attorney General, Office of Attorney General, 120 SW 10th Street, 2nd Floor, Topeka, KS 66612-1597

James L. Eisenbrandt, Attorney at Law, Berkowitz, Feldmiller, Stanton, Brandt, Williams & Shaw, 4121 West 83rd Street, Suite 227, Prairie Village, KS 66208


_____

Viola B. Stolte
Administrative Assistant

931