UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| STEVEN H. KASSEL,<br><br>      Plaintiff,<br><br>  v.<br><br>UNITED STATES OF AMERICA,<br><br>      Defendant. | No. 06-3273 SC<br><br>FINDINGS OF FACT AND<br><u>CONCLUSIONS OF LAW</u> |

I. **<u>INTRODUCTION</u>**

On August 5, 2005, Plaintiff Steven Kassel ("Kassel") was assessed a penalty of $29,633.00 ("Penalty") by the Internal Revenue Service ("IRS"), for violation of 26 U.S.C. §6700. In September 2005, Kassel paid 15% of the Penalty ("Payment") and subsequently filed a claim for a refund of this amount.

Kassel brought the instant action against Defendant United States of America ("Government"), seeking a refund of the Payment and a declaration that he did not violate Section 6700. <u>See</u> Petition at 4. In the alternative, Kassel sought a reduction of the penalty to $1,000.00 and a refund of any excess paid. <u>See</u> <u>id.</u>

1

1  The Government responded with a counterclaim seeking a judgment in
2  favor of the Government and against Kassel in the amount of
3  $29,633.00 plus interest and costs.  See Answer at 8.
4      On April 2, 3, and 4, 2007, a bench trial was held before this
5  Court.  Having considered the evidence presented by Kassel and the
6  Government, the Court hereby FINDS in favor of the Government and
7  against Kassel in the amount of $29,633.00 plus costs and interest
8  accrued at the statutory rate since the date of the Penalty's
9  assessment.

## II.  PRELIMINARY FINDINGS

1.  Kassel is an enrolled agent licensed to represent customers before the Internal Revenue Service.
2.  From late 1999 through December 2000, Kassel worked with Renaissance, The Tax People (TTP), an organization based in Topeka, Kansas.
3.  In 1999 and 2000, Kassel worked with TTP part-time and continued to operate his own business.  Kassel spent a larger percentage of his time in 2000 doing TTP work.
4.  TTP developed and sold various packages promoting strategies by which customers could reduce their claimed tax liabilities by taking advantage of tax deductions and other tax benefits related to the operation of a home-based business ("HBB").  In 1999 and 2000, TTP primarily sold the Tax Relief System (TRS), which included the TRS manual, audio cassettes, pamphlets, and other material that advised customers on deductions for their federal income taxes and other tax benefits.

1  5.   TTP sold TRS's through a multi-level marketing system whereby
2       TTP customers became Independent Marketing Associates (IMAs)
3       who sold TRS's to other customers.  The overwhelming majority
4       of TTP customers were also IMAs.  While some TTP customers had
5       a pre-existing HBB before purchasing a TRS, most did not.
6  6.   IMAs often sponsored presentations for prospective customers,
7       during which the IMAs presented information about the TRS and
8       the tax benefits customers could enjoy by purchasing a TRS.
9  7.   In 1999 and 2000, TTP paid Kassel a total of $29,633.00 for
10      his work for the company.
11 8.   In October 2000, TTP and its founder were sued by the State of
12      Kansas in the District Court of Shawnee County for committing
13      deceptive acts and practices in violation of the Kansas
14      Consumer Protection Act.  The court issued a temporary
15      injunction barring TTP and its founder from marketing products
16      and services to new customers and imposed restrictions on
17      business activities with existing customers.
18 9.   In December 2000, Kassel ended his affiliation with TTP.
19 10.  On or about August 5, 2005, the IRS sent proper notice to
20      Kassel of the assessment in the amount of $29,633.00  The IRS
21      has made a demand for such payment.  Kassel has not paid the
22      entirety of the assessed penalty.
23 /
24 /
25 **III. APPLICABLE LAW**
26      A.   Merits
27           1.   Section 6700
28
                                    3

The Government assessed Kassel the Penalty for his violation of 26 U.S.C. §6700(a)(1)(B) in combination with §6700(a)(2)(A). The Government therefore was required to show: 1) Kassel "participate[d] (directly or indirectly) in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (A)";[1] and 2) Kassel "ma[d]e or furnishe[d] or cause[d] another to make or furnish (in connection with such organization or sale)" 3) "a statement with respect to the allowability of any deduction or credit, the excludability of any income, or securing any other tax benefit by reason of holding any interest in the entity or participating in the plan or arrangement" 4) "which the person knows or has reason to know is false or fraudulent as to any material matter."

### 2. Section 162

Relevant for our purposes is 26 U.S.C. §162 regarding the deductability of business expenses:

> (a) In general.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including--
> (1) a reasonable allowance for salaries or other compensation for personal services actually rendered;
> (2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of trade and business; and
> (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

---

[1] Subparagraph (A) refers to "a partnership or other entity, . . . any investment plan or arrangement, or . . . any other plan or arrangement." 26 U.S.C. §6700(a)(1)(A).

4

26 U.S.C. §162; see Indopco, Inc. v. Comm'r of Revenue, 503 U.S. 79, 85 (1992) (interpreting Section 162). The Supreme Court has clarified that in order for an activity to qualify as a "trade or business" under Section 162, "the taxpayer must be involved in the activity with continuity and regularity and . . . the taxpayer's primary purpose of engaging in the activity must be for income or profit." Comm'r of Internal Revenue v. Groetzinger, 480 U.S. 23, 35 (1987).

B.   Penalty

Section 6700, as unamended, provides for the calculation of penalties for violation of §6700(a) in the following manner:  Such a violator "shall pay, with respect to each activity described in paragraph (1), a penalty equal to the $1,000 or, if the person establishes that it is lesser, 100 percent of the gross income derived (or to be derived) by such person from such activity. For the purposes of the preceding sentence, activities described in paragraph (1)(A) with respect to each entity or arrangement shall be treated as a separate activity and participation in each sale described in paragraph (1)(B) shall be so treated."  26 U.S.C. §6700(a)(2000)(amended 2004).  In other words, once Kassel's liability under Section 6700 was established, Kassel was subject to a $1,000.00 penalty for each time he participated (directly or indirectly) in a sale of a TRS, unless Kassel proved that the amount he earned as a result of that participation was less than that total.

The parties did not dispute that Kassel earned $29,633.00 for his work with TTP, and Kassel was assessed a penalty in that

5

amount.  Thus, the Government bore the burden of proving that Kassel (directly or indirectly) participated over thirty times in the sale of a TRS.

## IV. FINAL FINDINGS OF FACT & CONCLUSIONS OF LAW

1. The following statements contained within TTP materials were false:

    a. As to deductibility of certain expenses:

        i. <u>Profit Motive</u>: While TTP materials, in places, discussed the necessity of a profit motive, more prominent and frequent in the materials were examples which were completely inconsistent with a profit motive: for example, claiming $29,980.00 in HBB deductions on the same return where only $2,000.00 in HBB income is reported.

        ii. <u>Exclusive Use Rule</u>: TTP materials claim that the exclusive use rule can be "eliminate[d]" through strategies such as spreading TTP materials around one's domicile, thereby making the entire cost of the domicile deductable.

        iii. <u>Hiring Children</u>: TTP materials advise that one's children can be "hired" and paid up to $4,400 a piece, thereby "convert[ing] the former expense of children's allowance to tax deductible wages without paying any payroll taxes." But the materials do not make clear that the children must actually perform work on behalf of the HBB, and the

6

|   |   |   |
|---|---|---|
| 1 | | work they perform has to be an ordinary and |
| 2 | | necessary component of the HBB.  Similarly, once |
| 3 | | "hired," the TTP materials suggest that one's |
| 4 | | children can be provided with up to $5,250.00 in |
| 5 | | untaxable educational assistance.  But again the |
| 6 | | materials do not qualify this with the |
| 7 | | qualification that doing so must be an ordinary and |
| 8 | | necessary component of the HBB. |
| 9 | iv. | <u>Always Selling Theory of Deductions</u>:  TTP materials |
| 10 | | suggest that as long as one is constantly promoting |
| 11 | | one's HBB, for example, at church, at the grocery |
| 12 | | store, at one's primary place of work, and on |
| 13 | | vacation, the expenses associated with these |
| 14 | | activities are deductable.  As a result, the |
| 15 | | materials claim that one hundred percent of the |
| 16 | | expenses related to one's car can become |
| 17 | | deductable.  However, the materials do not make |
| 18 | | clear that the expenses associated with such |
| 19 | | expenses must be ordinary and necessary.  What's |
| 20 | | more, the Court finds that constantly promoting |
| 21 | | one's HBB on unrelated trips does not convert these |
| 22 | | activities into the conduct of business and trade |
| 23 | | under Section 162. |
| 24 | / | |
| 25 | b. | And other tax benefits: |
| 26 | i. | TTP materials claim that additional exemptions can |
| 27 | | be claimed on one's W-4 in order to gain an |

7

                            "instant pay raise."  The result is not an instant
                            pay raise, but rather a reduction in the
                            withholding amount and corollary increase in take-
                            home pay.  What's more, doing so without a
                            legitimate basis is fraudulent.
                    ii.    TTP materials guaranteed at least $5,000.00 in tax
                            savings for anyone who followed the TRS.  Even
                            assuming the problems with the deductions
                            propounded by the TRS discussed above did not
                            exist, such a guarantee is false in light of the
                            inherent differences in each person's tax
                            situation.
2.    Kassel knew those statements were false.  This was
        demonstrated by the following evidence:
    a.    In May 2000, Kassel sent two letters to TTP's outside
            counsel, Hugh Clemens, which described Kassel's problems
            with statements in TTP materials and by TTP personnel
            regarding inter alia:
            i.     Unwarranted claiming of exemptions on W-4's and the
                    characterization of the result as a "pay raise";
            ii.    The necessity of a profit motive;
            iii.   The hiring of one's children;
            iv.    The guaranteed tax deductions;
            v.     Deductions related to travel;
    b.    Kassel testified that:
            i.     He had problems with information regarding
                    deductions and other tax benefits in the TRS

8

1               manual;
2         ii.   He had problems with statements made by the
3               principal author of the TRS manual, Thomas
4               Steelman, in conference calls regarding deductions
5               and other tax benefits related to the TRS;
6         iii. He had problems with statements made in TRS
7               materials that the exclusivity rule could be
8               defeated by spreading TTP materials in every room;
9         iv.  He had problems with statements made by IMA's, at
10              meetings, related to claiming exemptions on one's
11              W-4;
12        v.   He had problems with the $5,000 guarantee made by
13              an IMA in a Fall 2000 opportunity meeting;
14        vi.  He had problems with the information in a TTP
15              promotional video, "Take a Bite Out of Your Taxes,"
16              and on a TTP website regarding deductions and other
17              tax benefits related the to TRS;
18        vii. He had problems with the characterization of the
19              increase in take-home pay which would result if
20              exemptions on one's W-4 were increased as "an
21              instant pay raise," and that doing so without a
22              legitimate basis is "tax fraud"; and
23        viii. That a profit motive was necessary in order for an
24              activity to qualify as trade or business under
25              Section 162.
26   3.   Kassel also should have known these statements were false.
27        a.   Notwithstanding his protestations that his tax expertise

         was limited to collection and compromise issues, the following evidence demonstrated Kassel's broader expertise, including issues of deductibility and the claiming of exemptions on one's W-4:

    i. The letters and emails described above which articulate his problems with TTP materials;

    ii. Statements in Court about: what is a proper deduction and what is a proper way to calculate exemptions; and

    iii. Generally holding himself out as a tax expert on his website, in his emails, and in his user group postings.

4. Kassel made or furnished this false information in the following ways:

    a. Directly selling two TRS's;

    b. Publishing claims that the information in TTP materials were "100% correct, legal, ethical, and moral";

    c. Promoting the TRS on his website in a manner that included summaries of several of the false statements described above; and

    d. Editing the TRS manual in which much of the false information described above was expressed.

5. And Kassel caused other persons to make or furnish this false information by:

    a. Promoting the TRS by:

        i. Speaking in favor of the TRS at opportunity meetings;

|  |  |  |  |  |
|---|---|---|---|---|
| 1 |  | ii. | Posting statements in favor of the TRS on internet |
| 2 |  |  | user groups; |
| 3 |  | iii. | Publishing statements in favor of the TRS on his |
| 4 |  |  | website; |
| 5 |  | iv. | Allowing his likeness and statements to be used in |
| 6 |  |  | TTP promotional materials; and |
| 7 |  | v. | Representing TTP at several IRS nationwide tax |
| 8 |  |  | forums. |

     b. Exercising his authority over IMA's.  Though Kassel protests that he had no authority over IMA's, evidence in the form of his own communications with other members of the TTP organization shows otherwise.

6. Kassel directly participated in the sale of two TRS's.

7. Kassel indirectly participated in the sale of other TRS's by:
    a. Speaking at opportunity meetings;
    b. Promoting the TRS through postings on user groups;
    c. Promoting the TRS through statements on his website;
    d. Promoting the TRS by allowing his likeness and statements to be used in TTP promotional materials;
    e. Editing the TRS manual;
    f. Promoting the TRS by representing the TTP at IRS nationwide tax forums;
    g. Becoming regional director of the TTP unit, Affiliated Tax Professionals Network, in 2000;
    h. Representing a TTP customer in a meeting with the IRS regarding the TRS;
    i. Hosting weekly conference call for TTP customers; and

   j. Submitting edits for the TTP promotional video, "Take a Bite Out of Your Taxes."

8. Together these activities constitute over 30 instances of direct or indirect participation in the sale of a TRS.

## V. CONCLUSION

In conclusion, Kassel, directly or indirectly, participated over 30 times in the sale of a TRS, and made or furnished, or caused another person to make or furnish, false statements as to the allowability of various types of deductions and other tax benefits which Kassel knew, or should have known, were false. Kassel, therefore, violated 26 U.S.C. §6700 and is subject to a penalty equal to $29,633.00, the amount of gross income which Kassel earned through his participation in the sale of TRS's. A

 Accordingly, the Court FINDS IN FAVOR OF DEFENDANT United States of America in the amount of $29,633.00, plus interest and costs. The Government is ORDERED to submit a calculation of applicable interest within fifteen days of this order.

 IT IS SO ORDERED.

 Dated: April 12, 2007

            _____
            UNITED STATES DISTRICT JUDGE

12